Edward M. Anderson (SBN 198183)
Regina Yeh (SBN 266019)
ANDERSON YEH PC
401 Wilshire Boulevard, 12th Floor
Santa Monica, California  90401
Tel: (310) 496-4270  Fax: (888) 744-0317
edward@andersonyehlaw.com
regina@andersonyehlaw.com

Attorneys for Plaintiff
HALEY CAMILLE FREEDMAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HALEY CAMILLE FREEDMAN, an individual;<br><br>Plaintiff,<br><br>v.<br><br>RYDE STUDIOS, LLC dba RYDE STUDIOS and dba KAT&BARE, a California limited liability company; NICOLAS GIBBS, an individual; RICHARD D'ALESSIO, an individual; BECKY TAHEL BORDO, an individual; and DOES 1 through 10;<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT FOR:**<br><br>1) **DECLARATORY JUDGMENT AND ACCOUNTING PURSUANT TO THE COPYRIGHT ACT;**<br>2) **DECLARATORY JUDGMENT PURSUANT TO THE CAL. REVISED UNIFORM PARTNERSHIP ACT;**<br>3) **BREACH OF CONTRACT;**<br>4) **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>5) **PROMISSORY ESTOPPEL;**<br>6) **FRAUD; AND**<br>7) **ACCOUNTING**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff Haley Camille Freedman ("PLAINTIFF" or "FREEDMAN") alleges as follows:

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

1.     The Court has federal question subject matter jurisdiction of the case or controversy herein pursuant to 28 U.S.C. §§ 1331, 1338(a)-(b), 2201 and 2202, and on the grounds that this is a civil action arising under the Constitution, laws, or treaties of the United States.  PLAINTIFF'S first claim for relief is for a declaratory judgment and accounting arising under, *inter alia,* the United States Copyright Act of 1976 as amended, 17 U.S.C. § 101, *et seq.* (the "Copyright Act") and 28 U.S.C §§ 2201 and 2202 (the Declaratory Judgment Act).

2.     The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over PLAINTIFF'S second through seventh claims for relief, all of which arise under California state law.  All seven of PLAINTIFF'S claims for relief arise from a common nucleus of operative facts, such that the state law claims are so related to the federal question claims that they form part of the same case or controversy under Article III of the United States Constitution.

### *Personal Jurisdiction*

3.     The Court has personal jurisdiction over each of the defendants in that each of the non-Doe defendants resides within the State of California and within this district, and/or is regularly doing business within the State of California and this district, and/or purposely directed wrongful and tortious conduct toward PLAINTIFF, who resides in this State and this district.  PLAINTIFF is informed and believes and thereon alleges that discovery or further investigation will also show that some or all of the Doe defendants reside within the State of California and within this district, and/or are regularly doing business within the State of California and this district.  Further, with respect to each defendant, including all of the Doe defendants, a substantial portion of the relevant acts complained of occurred within the State of California and

- 1 -

COMPLAINT

1  this district.  With respect to PLAINTIFF'S intentional tort claims, each of the

2  defendants to those claims engaged in intentional acts expressly aimed at the State of

3  California, causing harm that defendants knew was likely to be suffered in the State of

4  California, and PLAINTIFF'S claims arise out of or are related to the defendants'

5  forum-related activities.  The specific facts of personal jurisdiction with respect to each

6  defendant are detailed further herein.

7                                               *Venue*

8          4.        Venue is proper in the United States District Court for the Central District

9  of California, Western Division, pursuant to 28 U.S.C. § 1400(a), because all

10  defendants or their agents either reside or may be found within this district within the

11  meaning of said statute, and pursuant to 28 U.S.C. § 1391(b)(2), because a substantial

12  part of the events or omissions giving rise to the claims occurred in this district and/or a

13  substantial part of property that is the subject of the action is situated here.

14

15                           **NATURE OF THE ACTION**

16          5.        Hollywood's culture of sexual predation has always been enabled by the

17  predators' threats to destroy any defiant victim's career.  But just as certainly, those

18  threats have always relied on the complicity of the craven, the covetous, or sometimes

19  even the coldly calculating – the industry's men and women who distance themselves

20  from speaking victims, whether from spinelessness, greed, or even sheer opportunism,

21  to eliminate competition to their own climb up the industry ladder.  In one of the

22  harshest Hollywood truths of all, it is often the victim's false friends, rationalizing

23  business partners, and strategizing colleagues who actually carry out the career

24  destruction that is the predator's reprisal.  That is what the defendants did here.  After

25  the defendants encouraged PLAINTIFF to come out to a reporter with her #MeToo

26  story of a celebrity sexual assault, the defendants responded to the resulting pre-

27  publication heat by shunning PLAINTIFF and cutting her out of the business she

28  helped the defendants build.

6.   PLAINTIFF is a twenty-three-year-old gifted stylist, fashion consultant and blossoming creative director who built her nascent and formerly promising career on the sweat of her brow and undeniable natural talent.  To do so, FREEDMAN had to overcome an industry nightmare.  When she was twenty years old, she suffered a horrible, multi-day-long sexual assault by one of Hollywood's serial rapists who happens also to be a famous young actor.  When some of this habitual rapist's other victims came forward as part of 2017's amplified #MeToo movement, FREEDMAN decided that she might also.  But first, she checked with the named defendants here – her business partners in "Kat & Bare", a new Instagram-based fashion magazine.

7.   Months earlier, the defendants had actively solicited FREEDMAN to abandon her burgeoning career as an independent stylist and fashion consultant – in no small part by the now deep irony of pitching the planned magazine to FREEDMAN as a trumpet for female empowerment and social courage.  In May 2017, FREEDMAN had agreed to join the defendants and she had given her all to the venture ever since, truly believing in the defendants as her trusted business family.  So, before FREEDMAN went to the press to tell her terrible story, she confided in her partners.  In particular, FREEDMAN sought the sage advice of defendant RICHARD D'ALESSIO ("D'ALESSIO") on whether to speak or not, and the reassurance of all of the defendants that if she did, the defendants would not shun her.

8.   The named defendants all voiced to FREEDMAN that they were "100%" behind her, and would not only support her if she put her story out to the press, they even encouraged her to do so.  All of the named defendants affirmed that they would stand beside FREEDMAN in both emotional solidarity, and hand-in-hand with her in business, no matter the fallout.  D'ALESSIO  – a man with four daughters who knew that FREEDMAN viewed him as a father figure and mentor – communicated to FREEDMAN his strong support, cheerleading "female empowerment" encouragement to her almost up to the very hour that FREEDMAN steeled herself for the maelstrom and walked into a Los Angeles hotel room to tell her story to a reporter.

9.     On November 21, 2017, FREEDMAN endured a grueling videotaped interview with a respected media publication.  Over the course of several hours of probing questions and cross-examination in front of a recording video camera, FREEDMAN described in graphic detail how in August 2014 actor Ed Westwick ("Westwick") lured FREEDMAN to his isolated Glendower Estate mansion near Griffith Park and kept her captive there for almost two full days while he repeatedly raped her, interrupted by interludes of Westwick's crazed behavior such as standing facing his bedroom wall muttering angrily and incoherently to himself in the dark.

10.     Following FREEDMAN's interview, the publication launched into its pre-publication diligence process, including making requests for comment from Westwick and his representatives.  Westwick's industry machine came after FREEDMAN and the publication ferociously.  They were aided in no small part by the active assistance of Westwick's girlfriend, Jessica Michél Serfaty ("Serfaty").

11.     Serfaty is a fashion model who had business connections with FREEDMAN and later the defendants.  Serfaty saw her public relationship with Westwick as a golden ticket in her own industry climb – a golden ticket that Serfaty was not going to let slip away without a no-holds-barred fight against FREEDMAN'S story ever seeing publication.

12.     Westwick's and Serfaty's team spouted false denials.  They defamed FREEDMAN.  They scoured the Internet and FREEDMAN'S social and business connections for any dirt they might find to impugn FREEDMAN'S credibility, or even just simply to degrade her.  Serfaty gave distorted characterizations of her own communication history with FREEDMAN to paint FREEDMAN falsely as promiscuous, psychologically disturbed, and jealous, even though Serfaty knew that FREEDMAN was none of these things.

13.     Westwick and his lawyers threatened the publication with lawsuits, including the threat of expensive legal actions in far-flung forums, making clear that they would file them and make them expensive as a financial punishment to the

COMPLAINT

publication, whether or not FREEDMAN'S story was true and whether or not claims against the publication would have any merit.

14.    A cycle developed and repeated, with expected publication dates postponed by further allegations from Westick and Serfaty, and further rounds of diligence, followed by new expected publication dates, and then new allegations against FREEDMAN, and further postponement.  The publication's own hand-wringing trepidation began to do Westwick and Serfaty's work for them.  The publication's repeated delays themselves burned like flames at the foundations of FREEDMAN'S industry credibility, reputation and career, exactly as Westwick and Serfaty intended.  But the credibility of FREEDMAN'S story survived it all and the publication was about to pull the trigger.

15.    In a final desperate move, Westwick threatened to sue under what he saw as the protective law of Ireland, claiming to have travel receipts from relatives that purported to show that they had visited Los Angeles at the time of the rape, somehow proving in a non-sequitur that the rape therefore could not have happened.  Westwick refused to produce the alleged receipts for pre-publication review, threatening to bring them out only in post-publication litigation – effectively daring the publication to call the bluff or not.  The story's publication was put in a state of ongoing suspension due to fear of Westwick's threats, as improper and desperate as they were.  FREEDMAN was left with her story untold, while Westwick and Serfaty's confidence grew that they might succeed in silencing FREEDMAN.  By mid-January 2018, Westwick was back in the Hollywood night life scene, smugly triumphant that with the help of a phalanx of lawyers and Serfaty, Westwick had crushed another defiant accuser.

16.    In these dark moments, all of the defendants could have stood by FREEDMAN throughout, as they had assured her that they would.  Instead, they basely betrayed her.  FREEDMAN had stepped into the November 21st videotaped interview and its portal of no return believing that the defendants were her partners and supporters, and that D'ALESSIO, who had actively cheered her across the threshold,

was even her friend and a paternal mentor.  But the true situation appears now to have been that at least two of the defendants, NICOLAS GIBBS ("GIBBS") and BECKY TAHEL BORDO ("BORDO"), had each been angling for months, if not during the entirety of FREEDMAN's relationship with them, to reduce FREEDMAN'S role in the partnership or cut her out altogether.  All of the named defendants, with their names on stacks of creative decks and social media posts touting "female empowerment" and that the "future is female," responded to the Westwick and Serfaty firestorm by actively excluding FREEDMAN from performing services on the partnership's projects, including projects that FREEDMAN was instrumental in bringing to the venture.

17.     As soon as BORDO learned that FREEDMAN had given the interview, BORDO cut FREEDMAN out of all business email communications, even while BORDO continued to use FREEDMAN'S contacts to further the Kat & Bare Venture and BORDO'S own ends.  GIBBS, the nominal Chief Executive Officer of the partnership, intentionally caused the partnership to withhold FREEDMAN'S monthly pay, failing and refusing even to cover a bounced paycheck to FREEDMAN for October.  GIBBS claimed that the venture lacked funds, apparently unaware that BORDO had already admitted to FREEDMAN that the venture had somehow managed fully to pay BORDO.  BORDO even contacted Serfaty and brought her on to jobs that D'ALESSIO had already promised to the financially struggling FREEDMAN, with BORDO knowing that the move would block FREEDMAN from work unless D'ALESSIO stood up for FREEDMAN.

18.     D'ALESSIO himself became afraid of any delay in the story's publication might mean.  At the first sign that the story's original publication date was delayed for further fact checking, D'ALESSIO first abandoned FREEDMAN, then actively shunned her himself.  D'ALESSIO could have caused the defendants to pay FREEDMAN what she was owed, and he could have blocked or reversed BORDO'S gamesmanship in using Serfaty to block FREEDMAN from work.  But D'ALESSIO did neither.  Then D'ALESSIO cut FREEDMAN out of a long-planned business trip to

COMPLAINT

Asia that D'ALESSIO and FREEDMAN had worked on together for months.

19.     And during all of this, it appears that at least one of the defendants facilitated Serfaty learning FREEDMAN'S private medical information, which Serfaty and Westwick then tried to use in the publication diligence process to paint FREEDMAN falsely as a drug addict in rehabilitation, when in fact FREEDMAN has never been either one.

20.     When FREEDMAN objected to defendants' yellow behavior and demanded that they at least her pay for the work already done, defendants at first continued to stall and exclude FREEDMAN, and still failed to pay her.  But as the winter holidays came and went and the story failed to come out, D'ALESSIO believed that the Westwick and Serfaty hurricane had passed and that the threat of publication of FREEDMAN'S story had disappeared.  D'ALESSIO offered FREEDMAN a chance to return to the venture, and even implored her to come back.

21.     FREEDMAN wanted to be wrong that the people she had trusted with so much could really treat her so poorly.  So she even thought about D'ALESSIO'S proposal to forgive and forget and move on to better things together.  But then GIBBS made clear what the true situation was.  GIBBS caused the venture to continue to fail and refuse to pay FREEDMAN the monthly fees already owed to her, or even to cover defendants' own bounced check, unless FREEDMAN agreed that she had always been a mere independent contractor stylist with defendants, and not a partner or equity holder.  GIBBS even refused to provide FREEDMAN with copies of documents so basic as the written job description that the defendants had previously tendered to her, all while denying that FREEDMAN had been anything more than a mere independent contractor to the partnership, or even that defendants had ever made any promises to FREEDMAN at all.

22.     While they nominally and tentatively voice to her that she can come back, the defendants have made clear that they have no intention of recognizing her as the legal partner in the venture that she was and is.  As the defendants would have it,

- 7 -

FREEDMAN could return and work with the defendants again, but now she would be required to renegotiate on defendants' terms, with the fruits of FREEDMAN'S independent stylist and fashion career, and months of her fundamental creative work for them, already in the defendants' hands.  FREEDMAN'S leverage with the defendants is even worse, because FREEDMAN'S career and reputation has been deeply damaged by her act of speaking to the reporter coupled with the publication's failure to run the story -- a situation in which the defendants played an active part by encouraging FREEDMAN to tell her nightmare tale in the first place, and then not only shunning her, but with some of them even actively assisting Serfaty in digging into and distorting FREEDMAN'S private life to kill or stall the story.

23.     While the defendants wait for FREEDMAN'S decision on whether to rejoin them or not on renegotiated terms (as if there were really anything to weigh), the defendants continue to keep financial pressure on FREEDMAN.  They still refuse to pay her for amounts they agree that they owe, continuing to claim no money -- even though they appear to have paid all other staff everything owed, and have placed ads for new hires.  At the same time, the defendants continue shamelessly to exploit FREEDMAN'S creative work and business contacts without accounting to FREEDMAN for that in any way.

24.     The defendants' conduct toward FREEDMAN has been truly despicable and she is entitled to relief against each and every one of them.

**PARTIES**

*Plaintiff*

25.     *Haley Camille Freedman:* Plaintiff HALEY CAMILLE FREEDMAN is an individual and at all times relevant herein was a citizen and resident of the State of California and County of Los Angeles.  By twenty-three years old, before she ever met any of the named defendants, FREEDMAN had leveraged a degree in Fashion Design from the Fashion Institute of Technology in New York City, and sheer hard work and

powerhouse creative talent, into a rapidly accelerating career.  After graduating from FIT, FREEDMAN set a personal goal to become a creative director by the time she was thirty.  Prior to going into partnership with the named defendants, or even meeting any of them, she was well on her way to making this happen on her own.

26.   Through three years of sweat, risk-taking, networking and dedication, FREEDMAN built herself from the ground up into a desired stylist and fashion voice. By April 2017, FREEDMAN had become a successful and desired stylist and fashion consultant in the entertainment and fashion industries, with a book of clients that included Hollywood celebrities, fashion magazine publications, high fashion brands, and at least one major recording label.  FREEDMAN also had built an impressive and valuable network of fashion industry connections with models, modeling agencies, fashion retailers, wholesalers and showrooms.  Indeed, by April 2017, within the relatively close-knit fashion world, FREEDMAN had begun to develop some celebrity of her own as a stylist, having been featured in artist interviews and amassing tens of thousands of followers of her stylist work on Instagram.  And by April 2017, she had also caught the eye of the named defendants, who needed her talents desperately.

### Named Defendants

27.   ***Ryde Studios, LLC:*** PLAINTIFF is informed and believes and thereon alleges that defendant RYDE STUDIOS is a limited liability company organized under the laws of the State of California and with its principal place of business at 2254 South Sepulveda Boulevard, Los Angeles, California 90064.  PLAINTIFF is informed and believes and thereon alleges that defendants GIBBS and D'ALESSIO formed RYDE STUDIOS sometime in 2016, but that RYDE STUDIOS did not commence any meaningful operations of any kind until in or about October 2016 at the earliest.  RYDE STUDIOS regularly conducts business in this district, including the development and production of social media and digital media content.  According to public records, RYDE STUDIOS has a registered agent located in Los Angeles, California.
///

- 9 -

28.   ***Nicolas Gibbs:*** Defendant GIBBS is an individual.  PLAINTIFF is informed and believes and thereon alleges that at all times relevant herein, GIBBS was a citizen and resident of the State of California, County of Los Angeles.  PLAINTIFF is informed and believes and on that basis alleges that GIBBS is approximately thirty years of age; graduated from the California State University system in 2011 with a bachelor's degree in communications; and then began working in public relations and social media, with brief stints at The Audience and BPG Interactive before partnering with D'ALESSIO to launch RYDE STUDIOS sometime in 2016.

29.   GIBBS is currently at least nominally the Chief Executive Officer, or CEO, of defendant RYDE STUDIOS and is an owner, director, officer, manager, and/or managing agent of defendant RYDE STUDIOS.  GIBBS regularly does business in this district, including from RYDE STUDIOS'S principal place of business in Los Angeles.  PLAINTIFF is informed and believes and on that basis alleges that by April 2017, GIBBS had a background in some forms of social media for certain entertainment and media genres, but had little or no meaningful experience with the fashion or style industries, whether social media related or otherwise, nor had GIBBS ever successfully run a business of any kind, beyond whatever RYDE STUDIOS had been able to accomplish or not before bringing in FREEDMAN.

30.   ***Richard D'Alessio:*** Defendant D'ALESSIO is an individual and PLAINTIFF is informed and believes and thereon alleges that at all times relevant herein, D'ALESSIO was a resident of the State of California and the County of Los Angeles.  According to D'ALESSIO'S description of himself on d'alessio.me:

> Richard D'Alessio was born in Jersey and grew up in Toronto weened on hockey and beer, later he went on to become a master storyteller with a deft hand at casting, comedy and subtlety. He has since earned a preeminent reputation as an international commercial director.  He's directed over 500 commercials in 43 countries. He has four top ten-rated bud light Super Bowl commercials.  He consistently captures insightful human performances and employs inventive techniques.  His work has won numerous international awards including three Lions at Cannes, and has been included in four separate

COMPLAINT

television specials highlighting the world's best commercials. He's extremely well known in countries you've probably never been to, like India, Vietnam, Lebanon, Russia, Kazakhstan and Thailand to name a few.  For US television networks he has directed and conceived image campaigns for Shameless, Ray Donovan, Jay Leno's Garage, Witches of East End, Lizzie Borden Chronicles, and Secrets and Lies.  His high imapct [*sic*, impact] ideas have helped launch shows capture record breaking audiences and sustain viewer engagement.

31.    PLAINTIFF is informed and believes and on that basis alleges that the above professional description of D'ALESSIO is substantially accurate, and that he is in fact a highly successful and talented commercial director, with proven experience and success in many types of media and knows how to engage successfully with many types of audiences.  However, PLAINTIFF is informed and believes and on that basis alleges that by April 2017, D'ALESSIO had little or no meaningful experience in the fashion and style industries, and little or no meaningful experience in successfully engaging an audience of young women interested in fashion and style.

32.    D'ALESSIO currently holds the title of Chief Creative Officer at RYDE STUDIOS and is an owner, director, officer, manager and/or managing agent of defendant RYDE STUDIOS.  Despite GIBBS' nominally superior title of CEO, as between GIBBS and D'ALESSIO, D'ALESSIO is in practical reality the more powerful and authoritative of the two.  At least as between these two men, D'ALESSIO has the real ultimate say in not only creative decisions, but in the business decisions of the company.  In particular, if D'ALESSIO wanted to stop RYDE STUDIOS, or the Kat & Bare Venture, or GIBBS or BORDO, from taking a particular business course of action, or to cause them affirmatively to take a particular business course of action, D'ALESSIO had ample authority and power to do so.

33.    PLAINTIFF is informed and believes and on that basis alleges that D'ALESSIO allowed GIBBS to hold the title of CEO and to conduct some of the day to day business of RYDE STUDIOS and the Kat & Bare Venture, because D'ALESSIO would rather spend his time on other things, including creative work – but that ultimately all meaningful decisions by GIBBS (and BORDO) required approval or

ratification by D'ALESSIO in practical terms.  PLAINTIFF is informed and believes

and on that basis alleges that D'ALESSIO regularly does business in this district,

including from RYDE STUDIOS'S principal place of business in Los Angeles.

34.  ***Becky Tahel Bordo:*** Defendant BORDO is an individual and PLAINTIFF

is informed and believes and on that basis alleges that at all times relevant herein,

BORDO was and is a resident of the State of California and the County of Los Angeles.

PLAINTIFF is informed and believes and on that basis alleges that BORDO authored

the following "mini bio" description of herself on IMDB:

> Israeli born and Philly bred, Becky is an actress and writer.  She has
> been classically trained in Theatre, voice, and piano, with a Summa
> Cum Laude degree in Communication & Theater.  She has appeared
> as Ethyl on the ABC's Mixology, and Allison on the webseries Angry
> Young Women.  She is also the co-creator/writer of Sh*t I Learned in
> my 20s, Kevin Loves Becky, and Those Guys.

35.  PLAINTIFF is informed and believes that BORDO obtained an

undergraduate degree from Temple University in Communications in or about 2011 and

is an aspiring actress, writer and filmmaker.  However, BORDO'S primary

breadwinning profession until the end of 2016 was in fact as a nanny or "family

personal assistant."

36.  PLAINTIFF is informed and believes and thereon alleges that BORDO

regularly does business in this district, including from RYDE STUDIOS's principal

place of business in Los Angeles.  PLAINTIFF is further informed and believes and on

that basis alleges that as of April 2017, BORDO had little or no experience or

connections in the fashion or style industries, and little or no sense of how to build

audience engagement with fashion- and style-conscious young women, or the protocols

or sensibilities involved with interacting successfully with models, fashion

photographers, agencies, fashion retailers, wholesalers, showrooms and other fashion

and style industry players and resources.

37.  PLAINTIFF is informed and believes and on that basis alleges that prior to

January 2017, D'ALESSIO had come to know BORDO by virtue of BORDO working

- 12 -

as a tutor to D'ALESSIO'S nineteen-year-old daughter Charlotte.  In or about January 2017, D'ALESSIO hired BORDO to join RYDE STUDIOS and she was given the nominal title of Head of Creative Production.  BORDO is an owner, director, officer, manager and/or managing agent of defendant RYDE STUDIOS.  PLAINTIFF is further informed and believes that although RYDE STUDIOS and the Kat & Bare Venture expected BORDO to spend substantially all of her business time performing services for RYDE STUDIOS and the Kat & Bare Venture, in fact BORDO spent substantial portions of her business time from January 2017 to the present working on a documentary film project not associated with or for the benefit of RYDE STUDIOS or the Kat & Bare Venture.  Most of what BORDO did and does for the Venture was and is through use of FREEDMAN'S rolodex or the equivalent, and other resources FREEDMAN built independently and later contributed to the Venture.

### Doe Defendants

38.    PLAINTIFF is in the process of identifying and confirming the true names and capacities of the defendants designated as DOES 1 through 10, inclusive ("DOES"), and therefore sue these defendants by fictitious names at this time.  The DOES are individuals or entities affiliated or related to some or all of the non-Doe named defendants and, on information and belief, are residing in, or otherwise have or had relevant contacts in and with the State of California and this district during the time periods relevant to this Complaint, or are otherwise subject to the jurisdiction of this Court and venue here.  PLAINTIFF will amend her pleading to include the name or names of said individuals and/or entities when PLAINTIFF obtains sufficient information to do so.  PLAINTIFF is informed and believes and thereon alleges that each of the DOE defendants is in some manner or degree responsible and liable for the acts and omissions alleged herein.

### Agency

39.    PLAINTIFF is informed and believes and thereon alleges that in all matters and claims for relief alleged herein, each defendant was and/or is acting as the

agent of the other defendants, and with the authorization or ratification of the other defendants, and in the course and scope of that agency.  As set forth in greater particularity further herein, each defendant is vicariously liable to PLAINTIFF, including *inter alia* under principles of agency, in addition to being directly liable for his, her or its own conduct.

### Concert of Action/Aiding and Abetting Allegations

40.    PLAINTIFF is informed and believes and thereon alleges that in all matters and claims for relief alleged herein, each defendant, even if they did not themselves personally cause the harm to PLAINTIFF, gave advice or encouragement to the other defendants to act, operated as a moral support for the other tortfeasor defendants, knew the acts encouraged to be tortious, and said advice, encouragement and/or moral support and/or assistance was a substantial factor in causing the resulting torts.  Further, each of said defendants either actively took part in the tortious activity, or furthered it by cooperation or request, or lent aid or encouragement to the wrongdoers, or ratified or adopted the wrongdoers' acts done for their benefit.  Each of said defendants thus engaged in concert of action with the direct tortfeasors, aided and abetted the direct tortfeasors, and or is otherwise a joint tortfeasor with them.  As set forth in greater particularity further herein, each defendant is vicariously liable to PLAINTIFF, including *inter alia* under principles of concert of action and aiding and abetting, in addition to being directly liable for his, her or its own conduct.

### Non-Party Persons of Interest

41.    ***Ed Westwick:*** Current non-party Westwick is an English actor, approximately thirty years old, best known for his role as Chuck Bass in the teen television drama series *Gossip Girl*, which ran on The CW network from 2007 to 2012. He has had numerous other television and motion picture roles between approximately 2006 and the present, including, at least until recently, playing the character of Vincent Swan in the BBC Two television series *White Gold*.  PLAINTIFF is informed and believes that Westwick currently resides in this district, and in any event, Westwick

COMPLAINT

regularly travels to and does business in the State of California and this district.  In fact, PLAINTIFF is informed and believes and on that basis alleges that from time to time Westwick rents and resides for at least at weeks at a time in residences in this district, including at a large, isolated mansion known as the Glendower Estate, located near Griffith Park.

42.     PLAINTIFF is informed and believes and on that basis alleges that Westwick is one of Hollywood's sexual predators, and specifically is an alcoholic who becomes violent, crazed and abusive when he drinks.  PLAINTIFF is informed and believes and on that basis alleges that at least as of 2014, Westwick had a pattern and practice of seducing young women and then raping them once getting them alone, counting on his status, power and reputation to keep the women silent.  In November 2017, three different women -- Kristina Cohen ("Cohen"), Rachel Eck ("Eck"), and Aurélie Wynn ("Wynn") – each separately alleged that Westwick sexually assaulted them in 2014.  Each of these Westwick victims had remained silent until late 2017, when publication of Harvey Weinstein's decades of sexual predation amplified the #MeToo Movement.  In November 2017, Cohen and Wynn accused Westwick of rape, and Eck accused Westwick of sexual assault, with all such incidents alleged to have taken place in 2014, and at least one of them specifically at the Glendower Estate. PLAINTIFF has never met or had any contact with Cohen, Eck or Wynn.  However, based on her own experiences with Westwick, PLAINTIFF is informed and believes and on that basis alleges that the accounts of Cohen, Eck and Wynn as they have been reported in the press are likely substantially accurate.

43.     *Jessica Michél Serfaty:* Current non-party Serfaty is an individual, approximately twenty-six years old.  PLAINTIFF is informed and believes and on that basis alleges that Serfaty is and at all times relevant to the allegations herein was a resident of the State of California and the County of Los Angeles, and in any event Serfaty regularly spends time in, and does business in this district.  Serfaty is a model and occasional actress who first came to fame in 2010 as a contestant on *America's Top*

*Model*, and who since at least 2014 has worked as a fashion model, among other pursuits.  A significant portion of Serfaty's own fame has come from attaching herself in romantic or sexual relationships with more famous male celebrities.  Serfaty has a significant following on social media, including Instagram.

44.    ***Charlotte and Samantha D'Alessio:*** Non-parties Charlotte D'Alessio and Samantha D'Alessio are individuals and residents of the State of California and the County of Los Angeles, aged approximately nineteen and early twenties, respectively.  They are D'ALESSIO'S adult daughters.  Charlotte D'Alessio is best known for becoming instantly famous and obtaining professional representation when photographs of her attending the Coachella Music Festival in 2015 spontaneously went viral on Instagram, where she continues to have a following of several hundred thousand users.  Samantha D'Alessio is a college student and aspiring actress and writer.

# FACTS

## *2014 and Earlier*

45.    FREEDMAN grew up in Agoura Hills, California.  She was first introduced to the entertainment industry as a child, where she modeled in television commercials.  Even from this early age, FREEDMAN displayed a passion and flare for the arts, and especially fashion and design, and dreamed of pursuing a career in fashion, media, and entertainment.

46.    In 2012, FREEDMAN graduated from high school and moved to New York City to attend the prestigious Fashion Institute of Technology (FIT).  In or about early summer 2014, FREEDMAN graduated from FIT with a degree in Fashion Design.  FREEDMAN returned to Southern California actively to pursue her creative and career dreams.  She commenced work as a fashion stylist, with a specific personal goal of becoming a creative director by the age of thirty.

47.    As of early summer 2014, FREEDMAN had never met any of the named defendants or the persons of interest above.  Between then and now, each of them came into FREEDMAN'S life in ways that ultimately led to the claims herein.

COMPLAINT

48.     By far the most overtly monstrous was Westwick.  In the summer of 2014, on or about Tuesday, August 5, 2014, one of FREEDMAN's female friends, Ashlynn, invited FREEDMAN out to 1 Oak, a nightclub in West Hollywood, which at the time was regularly frequented by celebrities.  FREEDMAN left her own vehicle parked in front of Ashlynn's home and the two went from there to 1 Oak.  There, FREEDMAN and Ashlynn socialized with a number of regulars and/or friends of owners of that nightclub.  When the venue closed for the night, FREEDMAN and Ashlynn were invited to continue the evening with several others from the nightclub at a private house in the Hollywood Hills.  At this small after-party, FREEDMAN, then twenty years old, met Westwick.

49.     FREEDMAN recognized Westwick as an actor from The CW teen television series, *Gossip Girl*.  Westwick displayed an immediate attraction to FREEDMAN, flirting with her openly.  FREEDMAN reciprocated, and the two continued to flirt, escalating to kissing.  In the early hours of Wednesday morning, August 6, 2014, Westwick invited FREEDMAN and others to come back to Westwick's rented house, a mansion in the Griffith Park area known as the "Glendower Estate."  FREEDMAN agreed, and together with Westwick and two other individuals, FREEDMAN shared a car ride to Westwick's house.  It was clear that Westwick was sexually interested in FREEDMAN.  Ashlynn demurred the invitation, leaving FREEDMAN with Westwick and the two others, thinking FREEDMAN was in no danger, but rather would be in for a memorable and enjoyable experience with Westwick – a belief that FREEDMAN held as well.

50.     At Westwick's Glendower Estate home, FREEDMAN, Westwick, and others briefly socialized in the kitchen around the kitchen's island counter. Approximately half an hour after arriving at Westwick's house, the other guests left, leaving FREEDMAN and Westwick alone.  FREEDMAN and Westwick soon went to Westwick's bedroom, where they proceeded to have what began as consensual sexual intercourse.

- 17 -

COMPLAINT

51.     However, during their first intercourse, Westwick became violent and aggressive, demanding that FREEDMAN strangle him or slap his face and when FREEDMAN declined, putting his hands around her neck, and slapping her and strangling her, against her will.  Westwick also asked FREEDMAN to spit on him during sex.  When FREEDMAN likewise refused, he would spit on her.  When their first intercourse ended, FREEDMAN knew she never wanted to have sex with Westwick ever again and wanted to leave and go back to her own car and life.

52.     Westwick and FREEDMAN fell asleep, and neither awoke until late in the day on Wednesday, August 6, 2014.  When FREEDMAN awoke, she was in Westwick's bed, with Westwick sleeping beside her.  FREEDMAN got up and tried to use her cell phone – but she had no reception, and did not even know specifically where she was relative to Ashlynn's home where she had left her car, or how to get back to it.

53.     When FREEDMAN went out to the bedroom balcony, again trying to get reception, Westwick awoke.  FREEDMAN then told him that she wanted to go home, and requested either to use his phone or that he provide her with a WiFi password, as her own phone didn't seem to have any reliable or really usable service at his house.

54.     Westwick ignored FREEDMAN's requests that he facilitate her communicating with the outside world.  He assured her that he would drive her back to her car -- eventually.  First, though, Westwick wanted more sex with FREEDMAN.  FREEDMAN declined and asked to use the shower instead.  Westwick allowed her to use the shower, but soon came into the shower himself and began sexually interacting with FREEDMAN again, over her objections.  But the more FREEDMAN displayed and expressed that she did not want more sex with Westwick, the more aroused he became, pushing forward to take FREEDMAN, even though Westwick clearly knew she did not want any more sex with him.

55.     After the shower, FREEDMAN, upset and frightened, dressed and asked to leave.  Westwick again told her that when he was ready, he would take FREEDMAN to her vehicle.  But he didn't, and instead became more frightening, disturbing and angry

- 18 -

the more FREEDMAN talked about wanting to leave.  Westwick insisted on more intercourse with FREEDMAN, who clearly expressed that she did not want any more sex, but wanted to leave.  Westwick ignored her, removing her clothes and taking her sexually anyway.  During one or more of their bouts of intercourse, Westwick said that he wanted to penetrate FREEDMAN anally, and she refused, firmly telling Westwick that she did not want that.  Westwick penetrated FREEDMAN anally deeply with his fingers anyway, holding her down to do so over her protests.

56.    FREEDMAN became overwhelmed with confusion, fear, and shock.  She became distant, letting her mind leave her body while Westwick had his way with her physical self, hoping for it to end.  Eventually each session of intercourse from Westwick would end, but when FREEDMAN would ask again to leave, Westwick repeated the same refrain that he would take her back to his car when he was ready, becoming scary and threatening the more FREEDMAN insisted on leaving, raising his voice, and otherwise physically intimidating FREEDMAN into obeying his will.  FREEDMAN forced herself to sleep from shock and for emotional distance.

57.    Over approximately the next twenty-four hours, from the late afternoon or evening of Wednesday, August 6, 2014 to the late afternoon or evening of Thursday, August 7, 2014, the pattern repeated, with Westwick taking FREEDMAN for sex when he desired, even though he knew FREEDMAN wanted no more sex with him, and with FREEDMAN hoping for it to end.

58.    During all of this time and earlier, Westwick was clearly aware that FREEDMAN did not want more sex with him and instead wanted to leave.  Westwick repeatedly assured FREEDMAN that he would take her to her car himself, but when he was ready.  Westwick used fear and intimidation to keep FREEDMAN captive, further facilitated by depriving her from using a phone with any reliable service, or using any WiFi connection to the internet, to keep and discourage FREEDMAN from leaving until Westwick was done with raping her and ready to leave himself.  Westwick intentionally used fear and intimidation to make FREEDMAN afraid to go anywhere

except the bed, bathroom or bedroom balcony, and she did not.  Westwick's intentional conduct of fear and intimidation was made all the more horrific and nightmarish by sporadic moments where Westwick seemed crazed or psychologically disturbed.  As just one example, during the entire experience from being alone with Westwick from the early morning hours of August 6, 2014 until the late afternoon or evening of August 7, 2014, Westwick would have bouts of standing closely facing the bedroom wall in the dark, mumbling angrily and incoherently to himself.

59.     Eventually, in the late afternoon or early evening of August 7, 2014, Westwick finally let FREEDMAN leave the bedroom and drove her the several miles to where her car had been parked in front of Ashlynn's house, with FREEDMAN aware that Westwick was taking her there on his way to a Rihanna and Eminem "Monster" Tour concert at the Rose Bowl that same night, August 7, 2014.  FREEDMAN's car had been towed and impounded in the two days that Westwick had kept her captive. FREEDMAN got out of Westwick's car regardless, and fortunately Ashlynn was home to let her in.

60.     Finally out of Westwick's control, FREEDMAN told her friend Ashlynn that the experience with Westwick had been a bad one, but kept the details and that Westwick had actually raped FREEDMAN to herself as to Ashlynn.

61.     The next day, August 8, 2014, after getting her car out of impoundment and finally going home, FREEDMAN, in addition to being traumatized and exhausted, felt feverish.  She scheduled an appointment with a gynecologist.

62.     At the appointment, which took place on or about August 13, 2014, days after the events with Westwick, FREEDMAN'S gynecologist examined FREEDMAN and found her still physically bruised, bleeding, and internally torn and infected in her genital area, and documented this at the time.  FREEDMAN had no intercourse or sexual contact with anyone else between being sexually assaulted by Westwick and the August 13, 2014 medical examination: the physical damage and signs of rape on the August 13, 2014 medical report are from the encounter with Westwick.

COMPLAINT

63.    Within several days of being raped by Westwick, FREEDMAN also recounted the experience to her friend Ava and Ava's mother.

64.    In the days and weeks following, FREEDMAN struggled to process what she had undergone with Westwick, sought support from close friends and family, and considered reporting the encounter to the police or pursuing other legal action. Ultimately, however, FREEDMAN decided not to report the encounter, fearing that she would suffer backlash and that her entire career might be thwarted if she did.

65.    FREEDMAN made a conscious decision to stay silent.

### *August 2014 to April 2017*

66.    Over the next three years, FREEDMAN threw herself into her work, continuing to focus on her career.  During those three years, FREEDMAN met Serfaty, Charlotte D'Alessio and Samantha D'Alessio.

67.    FREEDMAN first met Serfaty sometime in or about 2014 on a shoot for catalog photographs of models wearing clothing and accessories for or through HauteLook, a members-only fashion, jewelry and accessories online shopping site, and a good source of work for young stylists and models.  FREEDMAN worked as a stylist on a HauteLook shoot where FREEDMAN served as a stylist and Serfaty was a model. From there, although the two did not have any meaningful contact over the next few years, each remained aware of the other in the relatively small fashion and style world in which both were successfully climbing.

68.    Between 2014 and early 2017, FREEDMAN became friends with Charlotte D'Alessio as the two frequented the same social circles, and then later FREEDMAN also became friends with Charlotte's sister, Samantha D'Alessio.  Both Charlotte D'Alessio and Samantha D'Alessio knew FREEDMAN not only as their friend, but also that FREEDMAN was an up and coming stylist and fashion consultant with rare talent.

69.    From her graduation from FIT in 2014 through and until April 2017, through freelance jobs and regular work with magazine publications and labels,

- 21 -

FREEDMAN became a sought-after stylist and fashion consultant for fashion photo shoots and other projects.  By early 2017, and at the age of only twenty-three, FREEDMAN had developed an impressive clientele, including Hollywood celebrities, fashion magazine publications, high fashion brands, and at least one major record label. FREEDMAN herself began gaining some of her own celebrity as a stylist, being featured in artist interviews and amassing thousands of followers on the social media platform Instagram.

70.     In the course of her work as a stylist and fashion consultant, FREEDMAN also became acquainted with numerous fashion models and other talent who would be part of creating photo shoots and other works, and had an excellent working reputation and relationships with models and modeling agencies.  FREEDMAN had also developed a sterling reputation and credibility with fashion retailers, wholesalers and showrooms, allowing FREEDMAN significant borrowing privileges key to styling shoots on a budget.

71.     By the first half of 2017, FREEDMAN was in high demand, regularly booking and performing well-paying stylist and fashion consulting jobs, such that FREEDMAN was earning as much as $5,000 a week or more on her own, and with her earning prospects and career generally looking extremely bright.

72.     Meanwhile, PLAINTIFF is informed and believes and on that basis alleges that in or about late 2016, GIBBS and D'ALESSIO had formed RYDE STUDIOS, and hired BORDO in or about January 2017.  PLAINTIFF is informed and believes and on that basis alleges that by about April 2017, the named defendants had obtained a substantial outside investment for RYDE STUDIOS, and specifically for a new Instagram-based social media fashion magazine aimed at young females.  Among other motivations, D'ALESSIO in particular wanted to enter this social media fashion space as a way to connect with his adult daughters Charlotte and Samantha, and in hopes that they would become an active part of the business.  But PLAINTIFF is informed and believes and on that basis alleges that by April 2017, while the named defendants had a

- 22 -

1   significant amount of money to work with, and a vague idea, they had no meaningful

2   experience or skills about how to execute it successfully.  Then D'ALESSIO found

3   FREEDMAN.

### April to June 2017

5   73.    PLAINTIFF is informed and believes and on that basis alleges that by in or

6   about April 2017, D'ALESSIO, GIBBS and BORDO were operating RYDE STUDIOS

7   as an entity; wanted to launch a social media-distributed fashion and style magazine;

8   knew that they wanted to call the magazine "Kat & Bare"; but had done little or no

9   meaningful development of the project beyond this and were at a loss for how to do so.

10  PLAINTIFF is informed and believes and on that basis alleges that D'ALESSIO'S

11  daughters Charlotte and Samantha were aware of the Kat & Bare project and the named

12  defendants' search for resources to develop and implement it.  PLAINTIFF is informed

13  and believes and on that basis alleges that Charlotte and Samantha D'Alessio both

14  suggested that D'ALESSIO contact FREEDMAN, who had proven talent and expertise

15  in the area.

16  74.    PLAINTIFF is informed and believes and on that basis alleges that as a

17  result of the suggestions from his daughters Samantha and Charlotte, D'ALESSIO

18  directed staff at RYDE STUDIOS to make contact with FREEDMAN.  On or about

19  April 21, 2017, a Friday, FREEDMAN received an email from Alexis Loya, a RYDE

20  STUDIO employee, introducing FREEDMAN to RYDE STUDIOS and the "newly

21  funded Instagram fashion magazine Kat and Bare, set to launch this June" and inquiring

22  whether FREEDMAN would be interested in styling one of their cover photoshoots.

23  The April 21, 2017 email also noted that D'ALESSIO was the company's Chief

24  Creative Officer and pointed FREEDMAN to D'ALESSIO's dalessio.me site with his

25  achievements.

26  75.    FREEDMAN had a busy schedule, did not recognize RYDE STUDIOS or

27  D'ALESSIO, and did not respond to the initial April 21, 2017 email.  On or about

28  Wednesday, April 26, 2017, the named defendants sent FREEDMAN another email,

following up on the first inquiry, supplying details about the proposed shoot, asking again if FREEDMAN would be interested, and proposing a telephone call to discuss.

76.     FREEDMAN responded the next day, Thursday, April 27, 2017, with an email apologizing for delayed response, expressing interest in at least a telephone conversation, and proposing times.  In or about this same April 21 to April 27 time frame, D'ALESSIO telephoned FREEDMAN directly and introduced himself, both as Chief Creative Officer of RYDE STUDIOS and as the father of FREEDMAN'S friends, Charlotte and Samantha D'Alessio.

77.     D'ALESSIO told FREEDMAN he would be cooking for FREEDMAN that coming weekend (which weekend was likely either April 22 and 23, 2017, or April 29 and 30, 2017), as he knew that Samantha D'Alessio had invited FREEDMAN and other young women to the D'ALESSIO home for a women's dinner.  FREEDMAN then made the connection for the first time between D'ALESSIO and Samantha and Charlotte and the RYDE STUDIOS inquiry.

78.     FREEDMAN attended the dinner at the D'ALESSIO household that weekend, where D'ALESSIO discussed RYDE STUDIOS and the Kat & Bare idea with FREEDMAN briefly in person.  FREEDMAN also had further communications with D'ALESSIO and BORDO and others at RYDE STUDIOS by email and telephone (and with D'ALESSIO in person at the dinner) in late April 2017 and early May 2017.

79.     In these communications, D'ALESSIO and BORDO expressed that they wanted to hire FREEDMAN for a particular photoshoot (Kat & Bare's first) scheduled for May 3, 2017 (later rescheduled to May 5, 2017).  In these communications, D'ALESSIO also briefly described the Kat & Bare concept as he saw it, in broad strokes.

80.     More specifically, D'ALESSIO informed FREEDMAN of the following:

a. D'ALESSIO was the Chief Creative Officer of RYDE STUDIOS, a production company that created content (largely commercials or advertisements) for social media platforms;

COMPLAINT

b. RYDE STUDIOS was planning to launch a photo fashion magazine or channel to be called "Kat & Bare," which would be showcased on Instagram;

c. Kat & Bare would be marketed to a female millennial audience, and D'ALESSIO was looking for a stylist that was savvy with this audience and could assist in this first photoshoot;

d. D'ALESSIO had asked his two older daughters for recommendations, and both of them knew FREEDMAN as a well-connected professional stylist in the fashion industry.  His daughters had then suggested FREEDMAN and had referred him to FREEDMAN's own Instagram account, which showcased both her personal style and some of her work as a stylist (and which had over twenty thousand followers, while Kat & Bare had zero); and

e. D'ALESSIO believed that FREEDMAN could be a good fit for the shoot, and possibly for a larger role.

81.   In these communications, FREEDMAN provided to D'ALESSIO and RYDE STUDIOS her freelance day rate (and half-day rate) for the project, to which the named defendants agreed without any negotiation.  FREEDMAN then accepted the job.

82.   In these late April and early May 2017 communications and in communications afterward, D'ALESSIO also specifically explained that, especially as a father to four daughters, he was incredibly inspired by the women in his life. D'ALESSIO said that he wanted to create something that could both inspire and promote women, that his daughters could be proud of, and that also perhaps most specifically would of interest to his model daughter, Charlotte, with whom he was the most immediately concerned about connecting and assisting in her life and career.

83.   Indeed, in a deep irony, D'ALESSIO, GIBBS, BORDO and all of the named defendants pitched and/or ratified the Kat & Bare concept to FREEDMAN (and others) as fundamentally about female empowerment, female control of their own

COMPLAINT

sexuality, lack of fear of establishment and convention, and freeing women from a need to apologize or be silent.  Some of the phrases that the named defendants used to describe the Kat & Bare project included:

- "Lifestyle, fashion, new world editorial that is exclusive to Instagram"
- "It's a way of life and a state of mind"
- "It's about young women of today, how they interpret beauty, create influence and assume a changing role in society"
- The fictional female avatar of the project, "Kat", was described as "sexy and sexual," "confident," "empowered," and "not PC"
- In the Kat & Bare "who are we" materials, young women were specifically encouraged to "have no fear to question," "have female empowerment," and "don't be 'PC'"
- "We're run by young empowered women who are fueled by raw beauty & untamed expression"
- "We focus on the identity politics, creative and sexual expression of being a young women [*sic*, woman] today"

84.     FREEDMAN expressed her enthusiasm about the concept of Kat & Bare and also her willingness to work on the photoshoot.  However, it quickly became clear to FREEDMAN that the named defendants had little or no experience in fashion or with fashion shoots, nor did the named defendants understand how to connect with their target audience or what would resonate with that audience and what would not.

85.     As just one example of the named defendants' fundamental lack of knowledge of the fashion photography business, as part of her ordinary preparations for a shoot, FREEDMAN requested that Kat & Bare provide an "LOR" for FREEDMAN to use to gather wardrobe materials and other materials from lending brands, retailers and/or wholesalers.  It is custom and practice in the industry for fashion shoots to borrow clothing, accessories and other items from retailers or wholesalers pursuant to

COMPLAINT

"Letters of Responsibility" or "LORs", which set up a basic bargain where in exchange for the right to "pull" or borrow clothing, jewelry or accessories, the fashion shoot agrees to take care of the property and return it in good order, and also to feature and/or credit the lender in publishing the shoot images.  However, the effectiveness of any LOR to obtain loanout materials is fundamentally dependent on the reputation of the presenter of the LOR and their relationship with the actual and potential lenders.

86.     PLAINTIFF is informed and believes and on that basis alleges that prior to FREEDMAN requesting an LOR from the named defendants, they did not have one and were unfamiliar with basics of LOR custom and practice in the fashion industry. FREEDMAN provided the named defendants with a form LOR.  On or about May 2, 2017 BORDO emailed FREEDMAN a RYDE STUDIOS and Kat & Bare LOR to use for the shoot, but when FREEDMAN presented it to potential materials lenders, the lenders gave the LOR essentially no weight, as the named defendants had no relationship with the lenders and no independent reputation on which to rely.  However, FREEDMAN had both, and she used her own reputation and relationships to obtain materials for the very first Kat & Bare shoot.

87.     On or about May 5, 2017, and after having reviewed the creative materials that the named defendants had provided to her, FREEDMAN showed up on location for the very first Kat & Bare shoot, with the garments, accessories, and props she had selected for the creative concept, and which she had used her own reputation and relationships to obtain.  There, FREEDMAN met GIBBS for the first time ever and also met BORDO for the first time in person.  D'ALESSIO was also present in person.

88.     The May 5, 2017 shoot went well and highlighted the immense gap between FREEDMAN'S skill set and expertise and the deep lack of these same skills and expertise among the named defendants.  Although nominally hired originally as a stylist, FREEDMAN in fact contributed to the shoot not only through her styling of the models, but also by collaborating with and directing the personnel on set during the production, and specifically collaborating with D'ALESSO to provide overall artistic

direction throughout the shoot. In practical reality, FREEDMAN not only styled the shoot but also gave substantial direction. D'ALESSIO and others remarked that FREEDMAN's vision and talents appeared to be a perfect match for Kat & Bare, and it was clear that she had a skill set, talent, experience and set of connections that none of the other named defendants had and that were critical to a fashion-focused venture like Kat & Bare.

89.    During and after the shoot and/or in the days following, D'ALESSIO, GIBBS, and BORDO each expressed to FREEDMAN that they wanted FREEDMAN to be an ongoing part of RYDE STUDIOS and Kat & Bare, and not just as an independent freelance stylist. Shortly after the May 5, 2017 shoot, they invited FREEDMAN to come to their working headquarters, which was at Imaginary Forces, a production studio in Venice, California.

90.    There, at an in-person meeting on a day in or about the week of May 8, 2017, D'ALESSIO, GIBBS, BORDO, then-assistant Alexis Loya, and FREEDMAN spent several hours together, discussing the overall creative and business vision of RYDE STUDIOS, including primarily the Kat & Bare venture. D'ALESSIO, GIBBS, and BORDO explained to FREEDMAN that through the Kat & Bare Venture, they were seeking to create an innovative avenue for commercial advertising and licensing. RYDE STUDIOS intended to develop a portfolio of Instagram accounts, which would include the Kat & Bare Venture's Instagram account @katandbare (https://www.instagram.com/katandbare) and also include accounts held by celebrities and others, including hopefully FREEDMAN'S. The named defendants also hoped to leverage the social media followings of photographers. Together, as the named defendants had schemed it, these accounts would have an aggregated audience of millions of users or followers, which the venture could then monetize.

91.    The named defendants hoped to leverage their planned audience of follower as an alternative, interactive, and specially targeted platform for luxury brands and major labels in the fashion industry to use for advertising and other promotion. In

COMPLAINT

essence, the named defendants hoped that the Kat & Bare Venture could market itself as a new kind of channel for brands and other potential clients for their advertising, marketing and promotion, in addition to being a creative and editorial voice resonant with young females.  In turn, the Kat & Bare Venture would likewise bring in more commercial projects for the larger RYDE STUDIOS.

92.     FREEDMAN quickly demonstrated her own clear creative vision and sense of how to develop the venture successfully, including to reach the target audience of young females, and to do so on a budget.

93.     Beginning at this May 2017 meeting at Imaginary Forces and continuing in their express and implied communications over the next several weeks, and by their conduct, the named defendants all proposed that FREEDMAN become a permanent, full-time member of the RYDE STUDIOS and Kat & Bare Venture team; contribute most or all of her business time as a stylist, fashion consultant and art director to RYDE STUDIOS and the Kat & Bare project; contribute her industry contacts, connections, expertise, creative talent, and her own established good will, including her social media following, to the venture; all for the benefit of RYDE STUDIOS and in particular the Kat & Bare project.  In exchange, among other consideration, FREEDMAN would be a full partner of RYDE STUDIOS' Kat & Bare venture (the "Kat & Bare Venture" or the "Venture"), and would also have the chance for equity in the RYDE STUDIOS corporate entity.

94.     The named defendants also promised that if FREEDMAN agreed to become the named defendants' partner, she would specifically hold the title of Art Director at RYDE STUDIOS, where she would work on the launching of the Kat & Bare Venture, and also work on other commercial projects that came in to RYDE STUDIOS and that were unrelated to Kat & Bare, and specifically would get to work closely with D'ALESSIO and be mentored by him.  The named defendants also all specifically offered and promised to FREEDMAN that she would be the art director for RYDE STUDIOS and the Kat & Bare Venture, not only in title, but in actual fact, and

would be individually credited as such on her work – thus offering FREEDMAN the chance to accelerate her personal goal of becoming a creative director by thirty by about seven years.

95.     In these communications with FREEDMAN in May 2017 and after, all of the named defendants, and D'ALESSIO in particular, specifically promised to FREEDMAN that the named defendants would provide her with enough professional hours as an art director, including under D'ALESSIO'S mentoring and active tutelage, to qualify FREEDMAN for membership in the Director's Guild of American ("DGA") and accompanying benefits, especially health benefits.  For FREEDMAN, the promised hours as an art director and qualification for DGA membership and health benefits was particularly key, including because FREEDMAN suffers from a pre-existing medical condition that requires ongoing and expensive medical treatment.

96.     Under the parties' agreement and understanding, the named defendants also agreed, in addition to all of the other terms, to compensate FREEDMAN with initial monthly pay of $1,500.00 for the remainder of May, later moving up to $3,500.00 per month for June, July and August.  For comparison and reference, FREEDMAN'S established rate for a single day shoot as of April 2017 was $1,250.00 for a photo shoot and $2,500.00 for a one-day music video.  The $3,500.00 monthly fee or stipend thus would have paid for less than three days of FREEDMAN'S time at her established rates.  By shortly after the May 2017 meeting and continuing to November 2017, the named defendants asked for, received and accepted essentially all of FREEDMAN'S business time and overtime (except for the occasional acting audition, which D'ALESSIO allowed and approved FREEDMAN to do).  This was well in excess of twenty days a month, every single month (with the possible exception of August when FREEDMAN took a pre-scheduled medical leave for several days), from in or about May 11, 2017 and through at least all of October 2017 and into November 2017.

///

COMPLAINT

97.     In the May and June 2017 communications and afterward, the named defendants also represented that they would provide FREEDMAN with a written agreement documenting and detailing the relationship.

98.     In the course of all of the above communications from late April 2017 to early June 2017, the named defendants, including GIBBS and D'ALESSIO specifically, all represented to FREEDMAN that at some point prior to the first May 5, 2017 shoot, GIBBS and D'ALESSIO had obtained a substantial initial investment from one or more investors in RYDE STUDIOS and/or the Venture.

99.     FREEDMAN accepted all of the above terms and changed her position to her detriment in reasonable reliance on the named defendants performing all of the above terms.  FREEDMAN performed her end of the bargain in every material way, contributing her own labor, resources and assets to the Venture, as identified above.  At the named defendants' express request, FREEDMAN also specifically forewent work for other clients on other projects and potential projects.  All of the named defendants knew that FREEDMAN was doing all of these things, and that she was doing so with the specific expectation of partnership and/or other equity interests and the other promised terms – and specifically *not* merely as an independent contractor stylist who would be turning over her valuable business connections and abandoning her established independent clientele to work more than full-time for the named defendants for a below-market monthly salary.

100.   By no later than June 2017, due to the needs of the position and at defendants' request and with defendants' knowledge and encouragement, FREEDMAN had ceased all of her independent stylist and fashion consultant work and was working only for defendants.  FREEDMAN devoted her full business time as a stylist, fashion consultant and art director to working with D'ALESSIO, GIBBS, and BORDO to launch, develop and promote the Kat & Bare Venture and RYDE STUDIOS generally (FREEDMAN on rare occasions still went on acting auditions, as D'ALESSIO knew and approved).  FREEDMAN also worked closely with D'ALESSIO on specific actual

COMPLAINT

and potential commercial project assignments that RYDE STUDIOS received or hoped to get outside of the Kat & Bare Venture.

### *The Shadow of Westwick*

101.   After the early May 2017 meeting at Imaginary Forces, FREEDMAN worked regularly as a stylist and art director on Kat & Bare photo shoots, including a shoot that took place on or about May 18, 2017 at This Warehouse in East Los Angeles. The shoot's designated photographer was the well-known fashion photographer Mike Rosenthal, and Serfaty was one of four selected models.  Serfaty arrived to the scheduled shoot late, the last of the models to arrive that day.  As FREEDMAN welcomed Serfaty and chatted with her, Serfaty told FREEDMAN why she was late. Serfaty had just begun to date a handsome celebrity, who had flown her to London, and she had only just returned to Los Angeles shortly prior to the shoot.  Initially coy about his identity, and, although FREEDMAN did not ask, Serfaty could not contain herself and soon identified her new celebrity lover to FREEDMAN: Ed Westwick.

102.   FREEDMAN was stunned and worried for Serfaty, and immediately told Serfaty that she should "be careful."  When Serfaty asked why, FREEDMAN continued to be silent about her own rape experience with Westwick.  Instead, FREEDMAN communicated to Serfaty just that she had heard that Westwick was an alcoholic and an angry one such that Serfaty should be careful with him, or words substantially to this effect.  Serfaty admitted that she had seen that side of Westwick herself, but that she believed it was only when he was drinking and he had promised Serfaty to stop. FREEDMAN was internally upset and disturbed, but remained professional, and silent about her own intimate knowledge that Westwick was a rapist.

103.   During this styling session with Serfaty on or about May 18, 2017, in discussing the topic of alcoholism, FREEDMAN did, however, confide in Serfaty that FREEDMAN had recently ended a relationship with an alcoholic and abusive boyfriend, including having to obtain a protective restraining order against him. FREEDMAN also confided in Serfaty that FREEDMAN'S ex was discussing the

COMPLAINT

dispute on social media and FREEDMAN had posted a responsive video on YouTube about it.  Serfaty would later disclose FREEDMAN'S confidence to Westwick and his team as part of their feverish attempts to discredit and degrade FREEDMAN to squelch her story and further enable Westwick to keep the industry from fully recognizing his serial rapist nature.

104.   After speaking with Serfaty, FREEDMAN left the set for several minutes to gather herself, and then returned and completed all of her professional duties in exemplary fashion, as usual.  FREEDMAN was torn about whether to warn Serfaty further.  FREEDMAN was uncertain how to voice to Serfaty directly (or at all) how Westwick had raped FREEDMAN, especially considering the elements of their mutual work and FREEDMAN'S professionalism, and because FREEDMAN specifically feared stirring the pot of a powerful industry player.  FREEDMAN also specifically feared losing her job and career.  FREEDMAN resolved again to leave the Westwick matter to her past as much as she could, and to stay silent and carry on professionally.

105.   The May 18, 2017 shoot completed successfully, and one of Mike Rosenthal's photographs of the four models, including Serfaty, became Kat & Bare's very first post to Instagram, on June 1, 2017.  Serfaty is the model farthest to the right.

### *June to July 2017*

106.   For the next several months and into at least November 2017, and with the exception of a small number of independent stylist and fashion consultant projects that FREEDMAN completed by June, FREEDMAN devoted substantially all of her business time as a stylist, fashion consultant and art director, including late nights, weekends and holidays, to work on the Kat & Bare Venture and on other actual and prospective projects for RYDE STUDIOS and/or D'ALESSIO (possibly on rare occasion still going on acting auditions with D'ALESSIO'S knowledge and approval). In addition to contributing her talent, experience and labor, at the named defendants' express request, FREEDMAN also contributed her valuable contacts in the fashion and entertainment world.  FREEDMAN connected the named defendants and the Kat &

Bare Venture with models, talent representatives, clothing and accessory manufacturers and retailers, and other resources, to which the named defendants otherwise had no access or reasonable hope of access, all for the purpose of developing and advancing the Kat & Bare Venture and RYDE STUDIOS generally.  FREEDMAN also helped defendants find and connect to the venture's sometimes-purported (although not actual) namesake, fashion photographer Kat Irlin (her Instagram account @kat_in_nyc currently has over 1 million followers).  FREEDMAN assisted defendants in interesting Irlin in working with defendants and PLAINTIFF is informed and believes and on that basis alleges that Irlin would not likely have worked with defendants without FREEDMAN'S specific inputs to designing the brand's look, feel, style and messaging.

107.   D'ALESSIO in particular consistently reaffirmed to FREEDMAN that she was a creative and business partner in the venture, would get the chance to be an equity holder in RYDE STUDIOS, and was also specifically D'ALESSIO'S creative partner in their creative work for both the Kat & Bare Venture, for RYDE STUDIOS, and with D'ALESSIO himself.

108.   While FREEDMAN held up her end of the bargain, including in devoting herself fully to RYDE STUDIOS' and the Venture's creative and business endeavors and helping build the Kat & Bare brand (and some of D'ALESSIO'S potentially independent projects), on the other end, the named defendants often failed to live up to their obligations and duties to FREEDMAN, even before Westwick and Serfaty's later smear tactics.

109.   Once the defendants had induced FREEDMAN to give them her contacts and give up her independent career to work with them on the Venture, all of the named defendants, and GIBBS in particular, stalled and dissembled on providing FREEDMAN with a writing fully memorializing her relationship with the Venture and the defendants.  The named defendants kept promising FREEDMAN it was coming.  They nonetheless consistently failed to provide it.  At the same time, prior to tensions exploding when FREEDMAN went to the press about Westwick, the named defendants

also never denied FREEDMAN'S status as a partner in the Kat & Bare Venture or the promises of equity in RYDE STUDIOS. Indeed, instead, they consistently re-affirmed to FREEDMAN that she would enjoy the benefits of the future success of Kat & Bare and RYDE STUDIOS, meaning as their partner or other equity stakeholder.

110. PLAINTIFF is informed and believes and on that basis alleges that the named defendants burned through their funding investment at a rapid pace, because the named defendants' budgeting and management skills were poor. Some or all of the named defendants, and particularly D'ALESSIO and GIBBS, made extravagant expenditures, many of which were in their own personal interests at the expense of RYDE STUDIOS, the Venture, FREEDMAN and/or the investors.

111. In addition, and again in a deep irony, despite selling themselves and the Kat & Bare Venture as about the empowerment of young females, GIBBS in particular engaged in extremely disparate and prejudicial financial treatment of young female workers relative to other workers and service providers in the Kat & Bare Venture: for example, D'ALESSIO and GIBBS might pay an older male photographer and his team tens of thousands of dollars out of the Kat & Bare Venture's financed funds, on the one hand, but GIBBS would lead the named defendants in recruiting young female models to a shoot and then try to pay them nothing. At other times GIBBS would express his beliefs that the models should be happy to be paid with a pair of shoes or simply by the food provided at the shoot and free admission to an interesting venue.

112. The named defendants, particularly GIBBS as nominal CEO, simply had little or no experience in actually running and operating any ongoing business, especially one dependent on tying actual dollars available to budget relative to potential return on the creative product. For example, both GIBBS and D'ALESSIO wildly overspent on photoshoots, hiring "name-brand" photographers and their entire teams, but without consideration as to value added to the end product of the photoshoot, or the value added for the Venture or its investors.

///

113.   Both as a creative contribution and in an effort to maximize the use of the budget for each shoot, FREEDMAN offered her recommendations to the named defendants as to creative personnel for projects, and the use of FREEDMAN'S personal connections in the fashion industry.  It rapidly became clear that FREEDMAN'S connections were highly valuable, and GIBBS in particular even demanded and required that FREEDMAN provide GIBBS with FREEDMAN'S entire set of personal industry contacts as to models, influencers and other resources, so that the named defendants and GIBBS in particular could assess them and use them for the Venture. Promised that she had a permanent position and would share in the Venture's success, and wanting the Venture to succeed, FREEDMAN provided the information to GIBBS and the named defendants.  The named defendants often accepted FREEDMAN's recommendations and even required them, and thus regularly and knowingly relied on FREEDMAN's connections and goodwill to build both RYDE STUDIOS and the Venture.

114.   However, the named defendants, and especially GIBBS and BORDO, simply did not know what they were doing and/or were intentionally reckless or grossly negligent with FREEDMAN'S contacts, and burnt more of FREEDMAN'S goodwill with her own connections and resources than needed to happen.  For example, PLAINTIFF is informed and believes and thereon alleges that each month, the named defendants, directed in the first instance by GIBBS, knowingly caused payments to employees, contractors, vendors, models and other talent and suppliers to be issued late or to go unpaid altogether.

115.   Especially if D'ALESSIO was absent or not paying attention, GIBBS would also impose his own creative sense, including in defiance of such basics as approvals – for instance, intentionally creating posts featuring underage models holding alcohol, over the objections of the models' representatives; causing Kat & Bare to propose opening a video of one of FREEDMAN'S young female musician clients with the musician proclaiming that she was a "sex addict," even though the musician's

representatives and label would clearly never approve it and would be shocked to see it even proposed, and over FREEDMAN'S objection; and causing Kat & Bare to post (or proposed to talent representatives) images of and text about FREEDMAN'S clients without checking with FREEDMAN or listening to her judgment.  As a result of this unnecessary and unprofessional conduct by the named defendants and especially GIBBS, FREEDMAN'S relationship with at least one important source of business for FREEDMAN was irrevocably damaged, after FREEDMAN had spent years earning it.

116.   From June to at least August 2017, FREEDMAN continued to request a writing documenting the agreed terms of her relationship with the named defendants, and the named defendants continually represented that they were working on such a document.  At the same time, they continually failed to deliver any such writing.

117.   From June to at least August 2017, FREEDMAN continued to perform services for the named defendants and the Venture on more than a full-time basis, working late nights and weekends, conceiving, styling and directing shoots, authoring Kat & Bare style guides and creative decks, making material creative input to the overall look, feel and composition of the Kat & Bare Instagram feed, and generally doing everything she reasonably could do to support the Venture.  FREEDMAN also did substantial work on RYDE STUDIOS' (and D'ALESSIO'S) other actual and potential commercial projects, in direct creative partnership with D'ALESSIO.

118.   Almost from the outset, D'ALESSIO and FREEDMAN were natural creative partners.  Each seemed to recognize the talents and skill set that the other brought to the partnership, and PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO saw and creatively appreciated FREEDMAN'S creative talent, work ethic, toughness and determination.  It soon became clear within the Venture that as among D'ALESSIO, GIBBS, BORDO and FREEDMAN, it was D'ALESSIO and FREEDMAN as a team who were the real creative force and direction.  D'ALESSIO and FREEDMAN would spend many hours working together creatively, often without GIBBS and BORDO.  D'ALESSIO offered and promised to teach FREEDMAN and

COMPLAINT

provide her opportunities to become a creative director in areas beyond fashion, including in general commercial directing, and generally cast himself to FREEDMAN, and FREEDMAN saw him as, a mentor and even father figure.

119.   PLAINTIFF is informed and believes and on that basis alleges that the closeness of the connection between FREEDMAN and D'ALESSIO, and D'ALESSIO's appreciation and recognition of FREEDMAN's creative talents (implicitly or explicitly as being greater than either GIBBS' or BORDO'S), particularly coupled with the combination of FREEDMAN'S competence at such a young age, planted seeds of resentment in both GIBBS and BORDO toward FREEDMAN, and those seeds festered and grew.

120.   From time to time, D'ALESSIO would be absent from the Venture for extended stretches, working on commercial directing projects not ostensibly related to Kat & Bare (or about which relationship to RYDE STUDIOS and the Venture D'ALESSIO was vague or unclear).  In these D'ALESSIO absences, GIBBS would often attempt to seize the creative reins from FREEDMAN, including in ways that both hurt the Venture and that seemed intended as petty strikes by GIBBS at FREEDMAN. As just one example, D'ALESSIO and GIBBS decided that they wanted to bring in director Chris Applebaum, famous for his "EATS" videos which feature scantily clad models interacting with food in a highly sexualized way.  FREEDMAN pointed out that while Applebaum's work was undeniably popular and got lots of social media hits, it was off-brand for Kat & Bare, and in many ways conveyed the opposite of the type of message that Kat & Bare was trying to advance with its intended female audience.

121.   FREEDMAN proposed and conceived a Kat & Bare video series that she labeled "Models Eat," which would have Applebaum work with the models and food that were his trademarks, but conveying a more female positive message and that would be on brand for Kat & Bare.  Specifically, FREEDMAN'S Models Eat concept was designed and intended to be female empowering, showing more fully clothed models actually eating heartily, to counter pressures and stereotypes of young, attractive

COMPLAINT

women not eating for fear of gaining weight and being less attractive or photogenic.

D'ALESSIO approved the shoot as FREEDMAN conceived it, as did GIBBS

ostensibly, also as did Applebaum (who was being paid handsomely for the shoot).

Things went forward to hold the shoot on or about June 15, 2017, at a time when

D'ALESSIO would be and was absent.

122.   The June 15, 2017 shoot went forward, but through interactions with

Applebaum and GIBBS, who overrode and otherwise stepped heavily on

FREEDMAN'S creative authority and judgment in the absence of D'ALESSIO, the

shoot became almost the opposite of what FREEDMAN had intended.  Over

FREEDMAN'S vehement objections, GIBBS caused Kat & Bare to accede to and even

encourage Applebaum to shoot the models in bikinis and otherwise scantily clad, using

food to heavily sexualize the models, and with little or no connection to any fashion-

related mission or message, let alone any female empowering or socially conscious one.

FREEDMAN was so offended by the contortion of the shoot that she requested that her

name not be associated with it.  GIBBS frequently asked or even caused FREEDMAN

*not* to be individually credited on posts even when she should have been.  But for the

Models Eat shoot, GIBBS did the opposite, as a slight to FREEDMAN: he caused or

allowed Applebaum to put FREEDMAN'S name on the posts, knowing that was

exactly what FREEDMAN had asked not happen.

123.   GIBBS generally had difficulty interacting appropriately with the models.

As just one example, GIBBS came personally (and unnecessarily) to a shoot providing

significant amounts of alcohol, sat down in the set area and proclaimed himself as "the

booze guy," and encouraged the models to drink during the shoot – entirely

unprofessional and not the industry custom and practice by any means.  As discussed in

prior examples above, GIBBS also frequently betrayed a desire and intent to push

portrayal of models into heightened sexualization and sexual availability, and as

engaging in consumption of alcohol, for example an underage model holding a full

wine glass, over the objection of the model's representative.  And GIBBS also just

COMPLAINT

generally believed that the young female models did not deserve to be paid for their work and would be happy to work for minor barter gifts, which FREEDMAN repeatedly explained was not true and would damage the Venture's reputation in the industry, in addition to being the wrong thing to do legally and morally.

124.   FREEDMAN expressed to D'ALESSIO her frustration with GIBBS'S conduct with the models and that it was hurting the Venture.  PLAINTIFF is informed and believes and on that basis alleges that others did also, and that D'ALESSIO also saw it for himself.  D'ALESSIO eventually laid down new rules pursuant to which GIBBS was not to have contact with the models or their representatives, and those rules were in fact imposed.  To PLAINTIFF'S knowledge they were followed, and GIBBS was in fact removed by D'ALESSIO from direct contact with the models and their representatives.  PLAINTIFF is informed and believes and on that basis alleges that this exacerbated GIBBS'S growing grudge against FREEDMAN.

125.   Meanwhile, Serfaty continued to have growing connections with the Venture.  Serfaty was hired for and appeared as one of the models on the June 15, 2017 "Models Eat" shoot with director Chris Applebaum, in a styled scene sitting and wearing a fashionable dress savagely consuming a buttered lobster tail (one of the few scenes for the "Models Eat" shoot that remained relatively true to FREEDMAN'S original conception).  A video of the Serfaty lobster scene shot on or about June 15, 2017 appears on the Kat & Bare Instagram feed (posted at a later date).

126.   Serfaty continued her relationship with Westwick, but FREEDMAN could work with Serfaty without any contact with Westwick.  FREEDMAN did so professionally and even in a friendly way as to Serfaty, including continuing to stay silent that FREEDMAN had had any direct experience with Westwick and that Westwick had raped FREEDMAN.  FREEDMAN would also occasionally see Serfaty at social events, as the two moved in some of the same or overlapping social circles.  FREEDMAN and Serfaty were both mutually positive and friendly to each other.
///

COMPLAINT

127.   PLAINTIFF is informed and believes and on that basis alleges that during the summer of 2017, BORDO became dazzled by Serfaty's perceived A-list lifestyle, and BORDO sought out and developed a personal friendship with Serfaty.  For instance, rather than sending photo samples to Serfaty by email or messenger, BORDO would volunteer to make a long drive across the city to take them personally to Serfaty's residence, as an excuse to interact further and build a relationship with Serfaty.  At the same time, BORDO continued to become more resentful and dismissive of the precocious and talented FREEDMAN.

128.   PLAINTIFF is informed and believes and on that basis alleges that GIBBS and BORDO both eventually used the tension of FREEDMAN'S speaking out about being raped by Westwick to push and manipulate D'ALESSIO into ousting FREEDMAN and failing her as to most or all of D'ALESSIO'S promises to her.

### Late July to Early October 2017

129.   In or about late July and August 2017, D'ALESSIO was again absent for a significant stretch of time.  In or about late July and August 2017, as part of her "Models Eat" idea, FREEDMAN conceived and developed a short video project where a model would dress reminiscently of Marilyn Monroe and sing "Happy Birthday Mr. President" while standing behind a presidential press podium, with a birthday cake, all to be released by Kat & Bare on Barack Obama's 56th birthday, August 4, 2017.

130.   Kat & Bare and the named defendants all approved the project and FREEDMAN was the point person on execution, including art directing substantially the entire project.  The result was a highly professional and creatively successful video for which FREEDMAN was to receive individual credit, including in a tag on the post itself.  However, in D'ALESSIO'S absence, GIBBS caused the video to be posted without any individual credit to FREEDMAN.  When FREEDMAN objected, GIBBS told FREEDMAN that she did not need and would not receive an individual credit, because Kat & Bare was taking the overall creative credit and that FREEDMAN was part of the Kat & Bare team, and could count on enjoying Kat & Bare's future success.

After FREEDMAN complained to D'ALESSIO, GIBBS ultimately added FREEDMAN'S promised individual credit as a tag on the piece.  Such conduct by the named defendants and GIBBS in particular was not isolated: GIBBS regularly excused failing to credit FREEDMAN, or otherwise failing to make promised performances to her, on the explanation and justification to FREEDMAN that FREEDMAN was a part of the Venture and would enjoy its larger success (meaning or strongly implying as a partner or other equity stakeholder, or otherwise as someone with a guaranteed career and position).

### *Westwick Comes*

131.   In or about August 2017, FREEDMAN conceived and developed a Bonnie & Clyde/Runaway Lovers-themed photo editorial for the Venture, to feature a male and female couple and to be produced in late August or early September.  The named defendants and photographer Kat Irlin were all enthused about the proposed editorial and the group began considering models.  BORDO suggested that if the Venture chose Serfaty, that they might also get Westwick, who by this time had been dating Serfaty regularly for some months.  FREEDMAN did not want to work with Westwick, but did not object.  FREEDMAN even played along that Westwick and Serfaty were a potential choice, including because FREEDMAN did not believe that Westwick would agree (as he had never done this type of social media shoot, nor had he done a formal shoot as a couple with Serfaty), because FREEDMAN was not prepared to disclose and explain that Westwick had raped her, and also because FREEDMAN was trying simply to do her job.  BORDO by this time had established at least a work friendship with Serfaty, and pitched the idea to Serfaty.  BORDO reported back shortly thereafter that both Serfaty and Westwick had agreed to do the FREEDMAN-conceived Bonnie & Clyde/Runaway Lovers shoot with Kat & Bare.

132.   FREEDMAN continued to perform her duties for Kat & Bare dutifully and professionally, including preparations for the shoot with Serfaty and Westwick.
///

COMPLAINT

133.   The Runaway Lovers shoot took place on or about September 6, 2017, with Serfaty and Westwick serving as leads, and resulting in FREEDMAN being required to serve as stylist to both, and art director for the shoot.  Although deeply disturbed by again being in close physical proximity to the rapist Westwick, FREEDMAN continued to stay silent about the 2014 incident and performed all of her duties professionally.  And at the shoot itself, Westwick failed to recognize or remember FREEDMAN or displayed no indication that he did.

134.   After the Runaway Lovers shoot was completed, Serfaty the named defendants and FREEDMAN to join Serfaty and Westwick that night (on or about September 6, 2017) for drinking and karaoke at a local venue.  The event was actually or in practical effect a business event for Kat & Bare, and FREEDMAN dutifully attended, continuing to maintain her silence.  However, during the event, Westwick privately disclosed to FREEDMAN that he recognized her, saying in intimidating fashion to FREEDMAN words to the effect that two of them (Westwick and FREEDMAN) had a secret, and that Westwick expected FREEDMAN to keep it that way.  Westwick's remarks were intended by him and understood by FREEDMAN specifically to mean that Westwick recognized that he had raped FREEDMAN and a strong warning to FREEDMAN that Westwick expected her never to say anything about it.  PLAINTIFF is informed and believes and on that basis alleges that Serfaty either did not see or notice the exchange, or was oblivious to its dark meaning.

135.   During the karaoke night with Westwick on or about September 6, 2017, Westwick consumed significant amounts of alcohol, and displayed some of his personality as a disturbing and angry drunk to the group in attendance.

***Defendants Use Freedman's Contacts and Resources to Build the Venture and Obtain Financing and They Stall and Dissemble on Formalizing her Partner Relationship Status with Them***

136.   In or about late August and early September 2017, D'ALESSIO talked with FREEDMAN about how he and GIBBS were working on a business pitch deck for

- 43 -

COMPLAINT

RYDE STUDIOS and/or the Venture to pitch to investors at a meeting to take place in or around New York City on or about September 11 or 12, 2017.

137.   PLAINTIFF is informed and believes and on that basis alleges that D'ALESSIO and GIBBS in fact met with one or more potential investors in New York City on or about September 11 and 12, 2017.  PLAINTIFF is further informed and believes and on that basis alleges that the pitch was successful and at least one wealthy investor ("Investor L") agreed to significant further funding of RYDE STUDIOS and/or the Venture.  PLAINTIFF is further informed and believes and on that basis alleges that a substantial part of the pitched value of the Venture was in the fashion industry business contacts that FREEDMAN had developed independently and had contributed to the Venture, as well as in the look and feel of the posts that FREEDMAN had jointly authored, and the overall Kat & Bare Instagram feed, of which FREEDMAN was also a joint author.

138.   At about this time, D'ALESSIO and FREEDMAN discussed a raise in FREEDMAN'S monthly cash payment from $3,500.00 to $5,000.00.  D'ALESSIO initially told FREEDMAN that he was raising her monthly cash payment to that figure, including because he expected money from investors shortly and that FREEDMAN had been and continued to be instrumental in the Venture.  However, D'ALESSIO soon backtracked and told FREEDMAN that after speaking with GIBBS the raised monthly fee would be only $4,500.00.

139.   In or about this same September 2017 time frame, the named defendants (specifically GIBBS) provided FREEDMAN unilaterally with a one-page document on RYDE STUDIOS letterhead entitled "Art Director – Contract."  The document is vague and confusing, and GIBBS later characterized it as "not a contract, but a job description."  It nowhere mentions FREEDMAN'S name or has any line for her signature or anyone else's, and it is not signed by any individual.  The document sets forth a purported job description of the expected duties of an Art Director for RYDE STUDIOS, and characterizes the position as a "contract employee" position, including

- 44 -

with expected working restrictions that might apply to an employee more than an independent contractor.

140.   The document also identifies "Compensation" as "$4,500.00 per month for three months.  To be reassessed Jan. 1, 2018" and ends with a statement referring to "Equity Potential: Upon completion of this 3 month engagement we will assess performance and may present an equity package in K&B."  The document contains no copyright work-made-for-hire provisions whatsoever, or any other reference to ownership of intellectual property.

141.   PLAINTIFF is informed and believes and on that basis alleges that the intent of the document and the named defendants' provision of it to FREEDMAN was made intentionally unclear by the named defendants.  PLAINTIFF is informed and believes and on that basis alleges that the named defendants' provision of the document was a hedging attempt to accomplish the dual purposes of 1) appeasing FREEDMAN'S repeated requests for a written memorialization of the representations made to her in or about May and early June 2017 (and afterward) and upon which she had relied in materially changing her position to her detriment, and 2) setting the stage for an undisclosed intent by the named defendants actually or potentially to go back on their various promises to FREEDMAN, now that she was committed and had essentially irrevocably contributed the built up value of her prior career to the Venture.  FREEDMAN never agreed or consented to any reduction in the scope of promises, obligations and performances from the named defendants that caused FREEDMAN to give up her independent career and work with them.  Moreover, by the time of the named defendants' delivery of the "Art Director – Contract" document to FREEDMAN, FREEDMAN had already irrevocably changed her position to her detriment in reasonable and justifiable reliance on the named defendants' representations and promises, and the named defendants had knowingly accepted the fruits of FREEDMAN'S labor and other contributions.

///

- 45 -

COMPLAINT

142.   At all times, including after delivery to FREEDMAN of the "Art Director – Contract" document, the named defendants requested and required that FREEDMAN issue invoices to RYDE STUDIOS for her monthly cash compensation, and to the extent that the named defendants paid these invoices, they paid them without any tax withholdings or deductions.

### *Paris Fashion Week*

143.   From approximately September 26, 2017 to October 4, 2017, at D'ALESSIO'S request and direction, FREEDMAN traveled to Paris, France with a group composed of D'ALESSIO, FREEDMAN, D'ALESSIO's wife and some of their daughters, their nanny, photographer Kat Irlin, and at least one other RYDE STUDIOS staff member (Skyler Markham), to do creative and business work, including multiple fashion shoots, during and surrounding Paris Fashion Week.  GIBBS and BORDO did not come on the trip.  PLAINTIFF is informed and believes and on that basis alleges that D'ALESSIO affirmatively did not invite GIBBS and BORDO to attend and instructed them that they would not attend, and that this caused BORDO (and possibly GIBBS) further to resent FREEDMAN.

144.   During the Paris Fashion Week trip, D'ALESSIO and FREEDMAN worked exceptionally closely together as creative partners, both on content for Kat & Bare, and also on multiple creative decks for potentially lucrative commercial directing projects for RYDE STUDIOS and/or D'ALESSIO'S individual projects.  D'ALESSIO repeatedly represented and assured FREEDMAN that she would serve as art director and/or stylist for these projects, and that this would be financially rewarding for her and would also help her achieve professional hours toward DGA membership.

145.   Among the projects that FREEDMAN helped develop creatively with D'ALESSIO and jointly authored with him during this approximately late September to early October 2017 time frame were creative decks and directions for commercial projects for Jockey in India, a major automobile brand in Southeast Asia, Vivo in Kuala Lumpur, and Tomorrow Networks.  D'ALESSIO represented to FREEDMAN that

COMPLAINT

D'ALESSIO would soon make one or trips to Asia -- to pitch some or all of these projects to clients and/or to work on them once secured.  D'ALESSIO specifically induced FREEDMAN to work with him on the projects by representations and promises to her that D'ALESSIO would take FREEDMAN with him on the Asia trip or trips; actively mentor FREEDMAN, and that FREEDMAN would enjoy significant financial rewards from going on the Asia trips and otherwise continuing to work as D'ALESSIO'S creative partner, including fees related to commercial directing projects.

146.   By this time, FREEDMAN had significant respect and admiration for D'ALESSIO, and looked up to him from a professional standpoint – to be able to work with him closely on something like the Asia trips and related projects, and the repeated promises from D'ALESSIO that this would happen, was a significant factor in FREEDMAN not raising more vocal objections with the defendants about numerous issues, including being unduly tolerant about their practices of failing to pay her timely or at all, and about their recklessness with her business contacts.

147.   FREEDMAN would not have devoted her time and creative energies to jointly authoring these project materials with D'ALESSIO if D'ALESSIO had informed her that she would not be allowed to participate in the projects and that D'ALESSIO would exclude her from the Asia trip or trips.  Prior to Westwick and Serfaty's intense smear campaign in response to FREEDMAN'S interview to the reporter, D'ALESSIO never even intimated that there was any other plan.  Rather, D'ALESSIO affirmatively reaffirmed and represented to FREEDMAN that D'ALESSIO and FREEDMAN were creative and business partners on the projects, and that FREEDMAN would pitch and execute the projects with D'ALESSIO, including traveling to India and Southeast Asia with D'ALESSIO for the Jockey, Vivo, the automobile project, and others.

### *October 2017*

148.   Sometime during the two-month period between September 6, 2017 and November 6, 2017, Serfaty invited BORDO and FREEDMAN to another night of socializing and karaoke with Serfaty and Westwick.  FREEDMAN demurred,

explaining to BORDO that it was important to FREEDMAN to try and avoid being around alcoholic behavior such as Westwick had begun to show at the September 6, 2017 karoake event.

149.   PLAINTIFF is informed and believes and on that basis alleges that by in or about October 2017, the named defendants had blown through nearly all of their initial investment and had yet to receive the expected monies promised by Investor L in or about September 2017, and were hoping to receive it by early November 2017.

150.   On or about October 5 and 10, 2017, the *New York Times* and the *New Yorker* published stunning accounts of decades of sexual predation by Hollywood producer Harvey Weinstein.  The Weinstein stories and reactions to them became part of and intensely magnified the #MeToo Movement sometimes attributed as originally initiated by Tarana Burke in 2006.  Women and men began going public with allegations of sexual harassment and assault against numerous powerful and famous men in Hollywood and elsewhere, with the patterns of predation facilitated by threats and fears of career destruction.

151.   As mentioned in foregoing paragraphs, months prior to October 2017, GIBBS had been removed by D'ALESSIO from working directly with models or their representatives and generally removed from planning creative projects with the models. However, in or about late September or early October 2017, GIBBS informed FREEDMAN, BORDO and others at RYDE STUDIOS that Investor L's daughter was a shoe designer and had a sales stand for her shoes at the Del Mar horse racing track. GIBBS further informed FREEDMAN, BORDO, and others that Investor L and his daughter wanted the Venture to plan and conduct an event at the Del Mar track and the shoe stand during the November 3 and 4, 2017 Breeder's Cup, both to show what the Venture could do, and to help Investor L's daughter increase sales.  PLAINTIFF is informed and believes and on that basis alleges that by this point, the promised money from Investor L was overdue.  PLAINTIFF is informed and believes and on that basis alleges that Investor L was at least intimating to D'ALESSIO and GIBBS that the Del

Mar event would be a test, and that perhaps delivery of the investment rode on its success.  GIBBS and BORDO told D'ALESSIO and FREEDMAN that GIBBS and BORDO were taking charge of the Breeder's Cup event.

152.   GIBBS and BORDO in fact took charge of much or all of the planning for the Breeder's Cup event, but again demonstrated their lack of the required skill set for fashion creative work or working with models and production.  For example, GIBBS again insisted on such problematic conduct as not paying the models/influencers asked to participate, but rather expecting that they work for minimal barter compensation (*e.g.*, a pair of shoes and free admission to the racetrack).

153.   RYDE STUDIOS and the Kat & Bare Venture appeared and produced the event at Investor L's daughter's Del Mar track shoe stand during the Breeder's Cup weekend on November 3 and 4, 2017, but the event was nearly disastrous, including because GIBBS and BORDO had failed to arrange for numerous basic logistics necessary for the production (*e.g.*, parking passes and security clearances for bringing in large photographic props and photography equipment).  The influencers' manager accompanied her clients to the event, and had even invited friends and/or other business contacts, expecting to have a showcase event.  The model influencers and their representation were deeply unhappy with GIBBS' and BORDO'S compensation and other arrangements regarding their services.  Indeed, the influencers' manager was so livid at the way that GIBBS and BORDO had planned the event (or failed to plan it) that the manager berated GIBBS by email and chewed out BORDO in person.

154.   D'ALESSIO and FREEDMAN were left to scramble to adjust and modify the event in real time, the day of.  D'ALESSIO and FREEDMAN were able to improve the event substantially on the fly from GIBBS'S and BORDO's efforts.  However, GIBBS and BORDO again caused further unnecessary damage to FREEDMAN'S industry reputation and career (and the Venture's: D'ALESSIO described the GIBBS- and BORDO-led event as having "s[**]t the bed").  PLAINTIFF is also informed and believes and on that basis alleges that the need for GIBBS and BORDO to be saved by

FREEDMAN and D'ALESSIO further exacerbated GIBBS'S and BORDO'S resentment of FREEDMAN.

### November 2017

155.   On or about November 6 or 7, 2017, and inspired by the Weinstein scandal-amplified #MeToo Movement, actress Kristina Cohen publicly posted[1] on Facebook a detailed story of how Westwick had raped her in February 2014 at a large, isolated residence in the hills.  On or about the next day, on November 7 or 8, 2017, another actress, Aurélie Cao (stage name Aurélie Wynn) publicly posted[2] her own encounter with Westwick, in which she similarly alleged that Westwick had raped her in August 2014, and specifically at the Glendower Estate mansion.

156.   News publications including *The Hollywood Reporter, The Huffington Post*, and *Time* reported on these Facebook posts quickly.  Within a day or so, and via his own social media accounts, Westwick responded with complete denial of the women's stories.  On or about November 9, 2017, Westwick posted on Twitter a photo with the message, which provides in part[3]:

> It is disheartening and sad to me that as a result of two unverified and provably untrue social media claims, there are some in this environment who could ever conclude I have had anything to do with such vile and horrific conduct.

157.   When she learned about Cohen's and Wynn's stories, FREEDMAN experienced a strong emotional response.  FREEDMAN had done her best to move beyond her 2014 multi-day rape by Westwick.  But the accounts from the other women brought back horrible memories.  Reading the other women's stories was especially

---

[1] Kristina Cohen, Facebook (Nov. 7, 2017), https://www.facebook.com/kristina.kruz.5/posts/10211729772336179.

[2] Aurelie Wynn, Facebook (Nov. 8, 2017) https://www.facebook.com/ms.aurelie/posts/10100837619830039?pnref=story.

[3] Ed Westwick (@EdWestwick), Twitter (Nov. 9, 2017 9:53 AM) https://twitter.com/EdWestwick/status/928682058687291398.

COMPLAINT

1  disturbing because certain details were horribly similar to FREEDMAN's own,

2  including Westwick's effective weaponization of the Glendower Estate specifically,

3  with its relative isolation and poor cell phone reception, and Westwick's use of physical

4  intimidation, fear and force to keep the women from leaving.

5  158.   Meanwhile, on or about November 15, 2017, FREEDMAN discovered that

6  her semi-monthly cash compensation check from defendants for the second half of

7  October 2017 had bounced.  When FREEDMAN informed GIBBS that she had not

8  been paid, GIBBS apologized and said that it would be taken care, but GIBBS in fact

9  did nothing, nor did any of the other named defendants.  FREEDMAN has never been

10  paid any amounts by the named defendants since about mid-October 2017, and they

11  have never even covered the bounced check, despite numerous demands from

12  FREEDMAN that they do so.

13  159.   At about the same time as the bounced check communications with

14  GIBBS, FREEDMAN asked D'ALESSIO about the bounced check and the company's

15  finances generally.  D'ALESSIO explained to FREEDMAN that RYDE STUDIOS and

16  the Venture were depending on the money from Investor L.  As D'ALESSIO framed it,

17  the company would not have any money to pay anyone until Investor L's funds came

18  in, but that D'ALESSIO had "gig work" (D'ALESSIO'S commercial directing

19  projects), including the Asia trip or trips, that FREEDMAN would be able to work on.

20  D'ALESSIO specifically stated and even promised that he would provide FREEDMAN

21  with such gig work, including during the Asia trip or trips, to generate funds for

22  FREEDMAN to be able to use on such basics as paying her rent and buying food (with

23  FREEDMAN only in such a precarious financial state in the first place because she had

24  given up her independent stylist and fashion consultant career in reliance on

25  defendants' representations and promises).

26  160.   By mid-November 2017, neither D'ALESSIO nor GIBBS had said

27  anything to FREEDMAN that her overall performance was anything but exemplary, or

28  anything else in any way to the effect that she would be ousted from the business or that

COMPLAINT

there was any real chance that she would not be guaranteed a part of it, if it continued (with the possible exception of GIBBS' shady and vague "Art Director – Contract" document).  Moreover, D'ALESSIO and GIBBS continued to assure FREEDMAN that if she continued to provide services and resources to RYDE STUDIOS and the Venture (and to D'ALESSIO on his individual projects, if that is what they were), that FREEDMAN would reap future rewards.  D'ALESSIO in particular continued to assure FREEDMAN that D'ALESSIO and FREEDMAN were long-term creative partners and that D'ALESSIO would bring FREEDMAN into his commercial directing work more fully, with the goal and promise of training her to be a full-fledged creative director in the commercial context, and would otherwise mentor FREEDMAN.

161.  FREEDMAN, having long noticed the signs of mismanagement, was concerned about RYDE STUDIOS and the Kat & Bare Venture.  Nevertheless, FREEDMAN continued working during this time and indeed was deeply committed, not least by having given up her independent stylist and fashion consultant career. Furthermore, the promised Asia trip or trips with D'ALESSIO appeared imminent and FREEDMAN had worked very hard on the Asia projects.  During the month of November 2017 until at least November 21, 2017, FREEDMAN continued working with the named defendants, and D'ALESSIO in particular, to pitch multiple potential commercial projects, including for Jockey in India; a major automobile brand in Southeast Asia; Vivo in Kuala Lumper; and another, a women's apparel label and/or service (Cabi) operating locally in Los Angeles.  Again, FREEDMAN continued to perform for the named defendants in this way, despite having not been paid since mid-October and despite having not been reimbursed for significant work expenses she had incurred.

162.  FREEDMAN acted as D'ALESSIO'S partner in developing the material for all of the above pitches.  In early November, she played a substantial and active role in presenting RYDE STUDIOS and/or the Venture as a production company with the right creative sense and fit for women's apparel brands and labels, in the pitch to Cabi.

GIBBS and D'ALESSIO attempted to lead the pitch to Cabi without significant input from FREEDMAN, but did not have the creative sense necessary to connect to Cabi's decision-making executive (a fashion conscious female).  FREEDMAN, however was able spontaneously during the pitch to cause the Paris Fashion Week work to be presented and used successfully to convince Cabi that RYDE STUDIOS and the Venture could be the right voice and match for Cabi.  GIBBS, D'ALESSIO, and BORDO all acknowledged to FREEDMAN or in her presence that FREEDMAN was instrumental in developing and delivering the pitch materials to Cabi.

163.    In the parking lot after the Cabi pitch, FREEDMAN asked defendants when she would be paid.  At that point, defendants still had not covered their own bounced check for October 2017, and had not paid FREEDMAN anything for November 2017, meaning FREEDMAN had by that point been working for at least a month for no pay whatsoever.  GIBBS again represented that there was no money to pay anyone, even though BORDO had already separately informed FREEDMAN that BORDO had in fact been paid for all of October.

164.    The group went their separate ways for the evening.  BORDO then texted or emailed FREEDMAN demanding that FREEDMAN spend her evening and night servicing BORDO'S requests that FREEDMAN provide BORDO with various contact lists for models and influencers in New York, to yet again service Investor L's daughter.  FREEDMAN declined, and communicated to D'ALESSIO that she could no longer continue to do BORDO'S job for her for no pay.  D'ALESSIO responded that he understood and that he would tell his own daughters to decline in the same way if in the same situation.  PLAINTIFF is informed and believes that BORDO became even further resentful of FREEDMAN.

### *Freedman Tells Her Westwick Rape Experience to a Reporter, with Defendants' Prior Knowledge, Approval and Express Support*

165.    FREEDMAN's co-workers at RYDE STUDIOS, without knowing of FREEDMAN's story, reacted to the early November revelations by Cohen and Wynn

that Westwick was a sexual predator.  In light of Serfaty's and Westwick's at least occasional connection to the Venture, and not least because all of the named defendants had seen at least some signs of Westwick's alcoholism at the September 6, 2017 karaoke night, the topic of the Westwick rape and sexual assault stories came up without FREEDMAN raising them.

166.   To the contrary, up to this point, FREEDMAN had not shared her encounter with anyone, ever, except for a few very close friends and family, and her doctor and at least one lawyer (both in 2014, in the immediate aftermath of the incident).  However, in the context of the newly amplified #MeToo Movement and after witnessing Cohen and Wynn's bravery, FREEDMAN began to think that she, too, needed to overcome her fears, warn others against Westwick, and share her story.  But FREEDMAN was still also fearful about industry reprisals and wanted guidance from someone older and trusted.

167.   In or around mid-November 2017, FREEDMAN let D'ALESSIO know that she wanted to talk with him about Westwick.  In or around mid-November 2017, through in-person and/or telephone and text communications, FREEDMAN confided in D'ALESSIO as a friend, mentor, co-worker, business partner, and father figure that Westwick had raped her in 2014, at the same Glendower Estate home that was also the scene of at least one of the other Westwick victims' nightmare.

168.   FREEDMAN also explained to D'ALESSIO how she had not reported the encounter, and that she had not shared her story with anyone, ever, except a very small circle.

169.   FREEDMAN also informed D'ALESSIO that in May 2017 during a Kat & Bare Venture photoshoot, when Serfaty had informed her that Serfaty and Westwick had started dating, FREEDMAN had held back on telling Serfaty about her Westwick encounter, instead only telling Serfaty to "be careful" about Westwick's known alcoholism.

///

COMPLAINT

170.   D'ALESSIO expressed shock at these revelations, but also immediately voiced his support to FREEDMAN and her bravery in sharing the encounter with him. In the days that followed, D'ALESSIO continued to be supportive – indeed, more than that: D'ALESSIO even actively encouraged FREEDMAN to speak publicly about Westwick if she was ready.

171.   On or about November 19, 2017, D'ALESSIO affirmatively texted a link to the story of one of the women who had come out about a sexual assault by Westwick. FREEDMAN responded by again confiding in and consulting with D'ALESSIO that, yes, FREEDMAN was considering going forward with telling her story, too, in the midst of the #MeToo Movement. However, FREEDMAN also expressed to D'ALESSIO that FREEDMAN was concerned about the potential impact that her #MeToo story might have on the named defendants and their careers.

172.   D'ALESSIO said to FREEDMAN that he was "100%" behind whatever she chose to do in terms of sharing the story. D'ALESSIO also said to FREEDMAN that he would inform GIBBS and BORDO, but that he knew that they would likewise stand beside her and support her. Not long after, D'ALESSIO informed FREEDMAN that he had told GIBBS and BORDO about FREEDMAN'S Westwick story, and that both GIBBS and BORDO had communicated to D'ALESSIO that they were likewise fully supportive if FREEDMAN decided to go forward and tell it.

173.   FREEDMAN was encouraged by D'ALESSIO'S show of unconditional support, and by his report that the other named defendants also supported her. After further deliberation, FREEDMAN reached out to contacts that she had in the media and public relations industry, to determine the best course of action in terms of how to share her story. One of her contacts reached out to a number of media sources on FREEDMAN's behalf and caught the interest of a well-established major news publication ("Publication X"), which asked FREEDMAN to sit for an interview.

174.   FREEDMAN agreed. On or about November 21, 2017, and again communicating with D'ALESSIO just prior to giving the interview and again receiving

- 55 -

COMPLAINT

his support and encouragement, FREEDMAN went to a hotel in Los Angeles to meet with a reporter for a videotaped interview.  Close in time to commencement of the interview, D'ALESSIO texted FREEDMAN that he was "100%" supportive of her decision to tell the Westwick rape story to the press and that he thought it would be good for FREEDMAN to get "closure," in addition to other strong affirmations to FREEDMAN of D'ALESSIO'S personal and business commitment to stand by her.

175.   FREEDMAN went in to the interview believing that D'ALESSIO, GIBBS and BORDO all were emotionally supportive of her and also were committed to standing by FREEDMAN in business.  PLAINTIFF is informed and believes and on that basis alleges that the true facts were that GIBBS and BORDO saw that FREEDMAN would be vulnerable and each respectively intended to advance their own interests in FREEDMAN'S time of need, at FREEDMAN'S expense.

176.   In the late afternoon or early evening on or about November 21, 2017, FREEDMAN sat in a hotel room in Los Angeles, in person with a journalist from Publication X, where the journalist interviewed FREEDMAN, including on videotape, over the course of several hours, about FREEDMAN'S 2014 encounter with Westwick.

177.   After the interview, the journalist informed FREEDMAN that the story would be published on Monday, November 27, 2017.  Then, in the ordinary course, Publication X contacted Westwick or his representatives for comment, and the diligence process commenced.   FREEDMAN braced for what she believed would be a six day wait.

### *Bordo Begins to Exclude Freedman and D'Alessio Becomes Skittish*

178.   On November 22, 2017, the morning after the interview, D'ALESSIO texted FREEDMAN to ask her how it went.  FREEDMAN texted back that it was the scariest thing she had ever done, and D'ALESSIO remained supportive and even excited.  Unbeknownst to FREEDMAN, BORDO had already begun her maneuvers to cut FREEDMAN out of the Venture in FREEDMAN'S window of vulnerability.

///

COMPLAINT

179.   FREEDMAN did not learn it for certain until later, but when BORDO learned that FREEDMAN was about to become vulnerable by telling her story, BORDO moved against FREEDMAN within the partnership.  On or about November 21, 2017 and continuing thereafter, BORDO, who largely controlled work emails as the effective switchboard for the Venture, began intentionally stripping and excluding FREEDMAN from work emails on which FREEDMAN would usually be included. PLAINTIFF is informed and believes and on that basis alleges that, as admitted to PLAINTIFF later by D'ALESSIO, upon learning that FREEDMAN was exposing herself by going to the press with the Westwick rape story, BORDO also began to bad mouth FREEDMAN to D'ALESSIO.

180.   Including based on later admissions by D'ALESSIO, PLAINTIFF is informed and believes and that basis alleges that BORDO attempted to convince D'ALESSIO that FREEDMAN was not working hard enough, had otherwise failed the Venture in various ways professionally, and should be excluded from upcoming projects.  At the same time, BORDO continued to use FREEDMAN'S contact lists and the other business resources that FREEDMAN had contributed to the Venture to contact models, agencies, and hair and makeup teams and other resources, most or all of which were FREEDMAN'S in the first instance.

181.   Unaware that her trusted business partners had already begun to turn on her, FREEDMAN continued to look to them for support.  On or about November 24, 2017 (the Friday after Thanksgiving), FREEDMAN sought out D'ALESSIO'S further comfort and reassurance as she waited for the diligence process to complete and for the Westwick story to break.  D'ALESSIO learned from FREEDMAN then that the interview had been videotaped, and the fragility of his own resolve to support FREEDMAN in the situation he had cheered her into began to show.

182.   D'ALESSIO suddenly became skittish that the interview had been videotaped.  He warned FREEDMAN that she should not trust anyone she was talking with -- except D'ALESSIO and his wife.  However, after momentary shock that the

- 57 -

interview had been videotaped, D'ALESSIO appeared to gather himself, and again reassured FREEDMAN on or about November 24, 2017 of all of the following: that he would always have her best interests at heart; that he had again checked with BORDO and GIBBS; and D'ALESSIO, GIBBS and BORDO were all still firmly committed to supporting FREEDMAN emotionally and as a business partner and would not shun her. D'ALESSIO continued to text with FREEDMAN that day (November 24, 2017) and offered to continue to facilitate FREEDMAN telling her Westwick rape story and message of courage in speaking out, including by arranging for FREEDMAN to work with publishers on a book if FREEDMAN wanted to do it.

183.   FREEDMAN has never requested, been offered, or taken any money from anyone for telling her Westwick rape story to Publication X, or otherwise publishing it, nor has she ever demanded any money or anything else from Westwick.

184.   November 25 and 26, 2017 were the Saturday and Sunday of Thanksgiving weekend.  Many weeks or even months earlier, FREEDMAN had pre-scheduled to be out of the office the five days from November 27 to December 1, 2017, for medical treatments for a pre-existing condition, which treatments would take several hours each day.  FREEDMAN and those close to her expected the story to break that Monday, November 27, 2017, the beginning of FREEDMAN'S medical treatment week.  Trying to go about her life as normally as possible, and not knowing that BORDO was already peeling away FREEDMAN'S place in the business, FREEDMAN went to her treatments instead of going into the office.

185.   FREEDMAN nonetheless communicated to D'ALESSIO that she could come into the office during this time if anything arose where she was needed to support the Venture, or if there was "gig work" where FREEDMAN could earn money as she waited for the named defendants to receive the Investor L funds that were defendants' excuse for not paying FREEDMAN what they already owed her.  D'ALESSIO continued to reassure FREEDMAN that, scarcity of funds notwithstanding, the defendants would absolutely pay FREEDMAN for the work she had already done.

1   They did not and they never have.

2       186.   The story did not break on Monday, November 27, 2017.  It never would.

3             ***The Westwick and Serfaty Tempest – Late November 2017***

4       187.   In the afternoon of Monday, November 27, 2017, the story had not come

5   out.  At or about this time, Publication X communicated to FREEDMAN that they were

6   still fact-checking and that Westwick's team had requested a 72-hour hold, to at least

7   November 30, 2017, to produce evidence to discredit FREEDMAN.

8       188.   That evening, after her first day of treatments, FREEDMAN duly checked

9   in with D'ALESSIO on work matters by text.  Unusually, (and due to BORDO'S

10  intentional exclusionary efforts), FREEDMAN had received few or no work emails

11  since letting D'ALESSIO know that FREEDMAN would be giving the Westwick rape

12  interview.

13      189.   D'ALESSIO did not respond that evening.  PLAINTIFF is informed and

14  believes and on that basis alleges that the skittishness D'ALESSIO had shown upon

15  learning the interview had been videotaped was growing further and getting the better

16  of him as he failed to see the story published on November 27.

17      190.   On or about the next morning of November 28, 2017, D'ALESSIO

18  responded to FREEDMAN'S query of the day before.  D'ALESSIO informed

19  FREEDMAN via text that the Cabi pitch in which FREEDMAN had been instrumental

20  had been successful, and Cabi had confirmed that they wanted to hire the Venture.

21  D'ALESSIO informed FREEDMAN that the Cabi shoot would likely be on or about

22  December 12 or 13, 2017, after FREEDMAN returned.  FREEDMAN expressed

23  excitement and offered to come into the office immediately in between her treatment

24  sessions if needed to prep for the shoot.

25      191.   D'ALESSIO responded by asking if the FREEDMAN'S Westwick rape

26  story had been published yet.  FREEDMAN confirmed to D'ALESSIO that it had not,

27  but was now scheduled to be published November 30, 2017 (after Publication X

28  honored Westwick's request for a 72-hour hold).  As it would turn out, the diligence

- 59 -

COMPLAINT

process had only just begun, and Serfaty had decided to gamble that she could help kill the story if she helped Westwick smear FREEDMAN.

192.   On that same morning, November 28, 2017, FREEDMAN received a text from Serfaty.  In the text, Serfaty asked FREEDMAN: "[W]hat's going on with Ed?  Why didn't you talk to me about this???"  FREEDMAN did not respond to this text from Serfaty; nor did she inform any of the named defendants of its existence.

193.   PLAINTIFF is informed and believes on and that basis alleges that from the Serfaty text, and based on communications with the journalist from Publication X, by no later than the morning of November 28, 2017, Serfaty had become aware that FREEDMAN had been raped by Westwick in 2014; that FREEDMAN had told her story to the press; and that Publication X was planning to publish the story imminently, unless Westwick could refute it.  Based on the same and similar communications, PLAINTIFF is further informed and believes and on that basis alleges that by on or about November 28, 2017, Serfaty was actively assisting Westwick and his team of representatives in actively trying to discredit and defame FREEDMAN for the purpose of intimidating and otherwise discouraging Publication X from ever running the FREEDMAN Westwick rape story.

194.   PLAINTIFF is informed and believes and on that basis alleges that Serfaty's conduct in actively assisting Westwick to kill the story included Serfaty providing or describing (often falsely) purported texts from FREEDMAN to Serfaty.  Beginning on or about the morning of November 28, 2017 (and ultimately continuing for several weeks thereafter) FREEDMAN fielded numerous direct or indirect followup communications from the Publication X reporter, where the reporter relayed Serfaty's and Westwick's claims and false stories about FREEDMAN, and asked for FREEDMAN'S answer, explanation, denial or other response.

195.   Westwick and Serfaty were shameless in the depths of their dishonesty in the process.  For example, among Westwick's initial responses in the diligence process were that Westwick had never even met FREEDMAN prior to doing the Runaway

COMPLAINT

Lovers shoot with Kat & Bare, and had certainly never had sex of any kind with her. PLAINTIFF is informed and believes and on that basis alleges that Westwick maintained that completely false and dishonest position for almost two weeks during the diligence process, before finally admitting to Publication X in the face of overwhelming evidence that Westwick had indeed had sex with FREEDMAN in 2014. But, Westwick said, he could not remember anything about it (but denied that it was rape nonetheless).

196.  Serfaty for her part provided her text messages with FREEDMAN to Westwick's team.  Serfaty's text history with FREEDMAN was misrepresented, twisted and distorted to Publication X to try to paint FREEDMAN falsely as unstable, disturbed, jealous and promiscuous.  For instance, Serfaty found a photo shoot for Kat & Bare that involved a male model tied to a bed, which Serfaty directly or indirectly pushed to Publication X as somehow evidence that FREEDMAN is promiscuous (and thus implicitly, that even if FREEDMAN was promiscuous, which she is not, that promiscuity would somehow mean that Westwick would be free to rape her).

197.  Every time new dirt was thrown by Westwick and Serfaty at FREEDMAN, Publication X would contact FREEDMAN to explain and answer, which FREEDMAN did.

198.  FREEDMAN went through these sleazy and often ridiculous attacks and denials, and the seemingly endless cycle of listening and responding to Publication X's questions about them, without telling D'ALESSIO or any of the other named defendants anything about Westwick's and Serfaty's specific ugliness toward FREEDMAN in the process, or even much of anything about it at all.

199.  PLAINTIFF is informed and believes and on that basis alleges that Westwick and Serfaty's strategy was in part simply to delay the story's publication for as long as possible, because the delay itself in such matters begins to become its own self-perpetuating weapon against the defiant victim.  That phenomenon took effect here.

200.   PLAINTIFF is informed and believes and on that basis alleges that this publication delay phenomenon strongly affected D'ALESSIO, even after only several days.  D'ALESSIO had painted himself to FREEDMAN as a bastion of moral courage and strength.  However, by the second time the story's publication was postponed for further fact-checking, D'ALESSO lost his courage.  Whatever loyalty to FREEDMAN that D'ALESSIO had crumbled and he went to the standard industry playbook of seeking distance from the doubted or the already destroyed, and D'ALESSIO shunned and abandoned FREEDMAN to try to save himself.

### D'Alessio Abandons and Shuns Freedman

201.   PLAINTIFF is informed and believes and on that basis alleges that on or about the morning of November 28, 2017, or sometime shortly prior to that, D'ALESSIO received a contact from a potential client in India about a relatively small, very low budget job to shoot on December 5, 2017, when FREEDMAN would be back in the office in the ordinary course (the "December 5 Indian Job").

202.   In texts on the morning of November 28, 2017, FREEDMAN and D'ALESSIO exchanged the following information with each other:

      a.  The article had been postponed but was expected to come out on November 30;

      b.  FREEDMAN asked if the Asia trip was still on, and D'ALESSIO affirmed that it was;

      c.  D'ALESSIO referenced the December 5 Indian Job to D'ALESSIO, in a text that meant FREEDMAN would work on the shoot for the job, but that D'ALESSIO would have others at Kat & Bare handle the preparation work for the shoot (which needed to be done while FREEDMAN was out for her treatments) without bothering FREEDMAN.

203.   PLAINTIFF is informed and believes and on that basis alleges that on or about the morning of November 28, 2017, D'ALESSIO directed a RYDE STUDIOS staff member (Sean Miller) and BORDO to handle some of the December 5 Indian Job

preparation duties that FREEDMAN would ordinarily do. PLAINTIFF is informed and believes and on that basis alleges that D'ALESSIO specifically directed Miller to find a stylist and directed BORDO to cast a model audition for November 30, 2017, all for the December 5 Indian Job, which FREEDMAN would take over and run when her treatments completed.

204. In the ordinary course, even if absent from the office, FREEDMAN would have been aware of the activity surrounding the November 30 audition prep by being copied on email chains, but BORDO was intentionally stripping and otherwise excluding FREEDMAN from the chains. So what happened next happened mostly in the dark as to FREEDMAN, but on information and belief, including as largely admitted to FREEDMAN later by D'ALESSIO, FREEDMAN alleges the following: On or about November 28, 2017 or November 29, 2017, BORDO, without consulting D'ALESSIO or FREEDMAN, intentionally contacted Serfaty. BORDO told Serfaty about the November 30, 2017 audition and the chance to come into Kat & Bare's offices that day. PLAINTIFF is informed and believes and on that basis alleges that BORDO only contacted one other model for the November 30 audition, and that was a model that BORDO knew would never do the December 5 Indian Job, because the budget was too low.

205. At that time, all of the named defendants knew that FREEDMAN had told her Westwick rape story to Publication X; they all knew that Serfaty was Westwick's ongoing girlfriend and lover; and they all knew that the story's publication was delayed because Westwick had asked for more time to gather evidence against FREEDMAN. PLAINTIFF is informed and believes and on that basis alleges that as of November 29, 2017, D'ALESSIO was unaware that BORDO was actively trying to bring Serfaty into the December 5 Indian Job, or that the Westwick story would again be postponed, beyond the already delayed November 30, 2017 date. Thus, as of November 29, 2017, D'ALESSIO still intended to hold out the December 5 Indian Job to FREEDMAN as one of the gigs that would allow FREEDMAN to survive financially through the

COMPLAINT

holidays and otherwise weather the severe financial straits into which the defendants had placed FREEDMAN by their own conduct.

206.   In the evening of November 29, 2017, with another day gone by without receiving any business updates, FREEDMAN texted D'ALESSIO and asked when the defendants expected to have money to pay FREEDMAN.  FREEDMAN expressly told D'ALESSIO that she was having a hard time paying her rent and bills, including because she had been advancing expenses for defendants without reimbursement (and, as D'ALESSIO also already knew, defendants' check to FREEDMAN for October had bounced, and defendants had not made good on the bounced check or paid FREEDMAN anything for November).

207.   D'ALESSIO then responded to FREEDMAN as follows:

a. D'ALESSIO told FREEDMAN "we can pay you what we owe you for sure" but that beyond that (D'ALESSIO said) Investor L was still withholding funds, and so defendants would not pay FREEDMAN her agreed monthly cash fee, but would provide FREEDMAN with "gig work" so she could pay her rent and eat;

b. D'ALESSIO further told FREEDMAN that he already had at least two "gigs" for FREEDMAN to work on for money in December, and more coming: the December 5 Indian Job, the Cabi job, and others in the pipeline including a "China gig".

208.   PLAINTIFF is informed and believes and on that basis alleges that Miller for unknown reasons did not follow through on or was unable to find a replacement stylist for the November 30 audition for the December 5 Indian Job.  By the morning of November 30, 2017, there was no stylist arranged, and D'ALESSIO began to stress. On the morning of November 30, 2017, at 9:08 a.m. D'ALESSIO texted FREEDMAN urgently wanting her to call him to help December 5 Indian Job, including starting work immediately, with the November 30, 2017 audition scheduled for that day.  At about this same time on November 30, 2017, Miller also texted FREEDMAN about the

COMPLAINT

December 5 Indian Job, for the purpose of arrange FREEDMAN working as a stylist for it.  FREEDMAN texted back enthusiastically to D'ALESSIO that she would call him at about 10:00 a.m., and otherwise celebrating the job with texted capital letters and exclamation points.  It was crystal clear from FREEDMAN'S texted response to D'ALESSIO that FREEDMAN was on board and ready and anxious to work – and that she was thrilled and relieved for the confirmation that her worst fears had not come true and her partners weren't actually shunning her.  Her relief vanished in a matter of minutes.

209.   Based on subsequent text communications from Miller and D'ALESSIO and later explanations and admissions by D'ALESSIO to FREEDMAN, and the pattern of Serfaty's attacks on FREEDMAN in the publication diligence process, PLAINTIFF is informed and believes and on that basis alleges that what happened next was this:

    a. Serfaty told BORDO that Serfaty had decided to come to the Kat & Bare offices and audition for it (all exactly as BORDO had hoped);

    b. After D'ALESSIO had reached out to FREEDMAN to come in for emergency prep, BORDO informed D'ALESSIO for the first time that BORDO had asked Serfaty to audition and that Serfaty had agreed and was about to come into the offices (or possibly Serfaty arrived and D'ALESSIO saw her);

    c. D'ALESSIO immediately recognized that for BORDO to have even invited Serfaty to audition was severely problematic, a betrayal of FREEDMAN, and that BORDO "should have known better";

    d. D'ALESSIO knew that it was not too late to change the audition casting process and not involve Serfaty, and that if he did so, it would save the December 5 Indian Job for FREEDMAN, and that if he did send Serfaty away, it would be crushing to FREEDMAN and likely be the beginning of the end of her place in the partnership;

///

- 65 -

   e.  D'ALESSIO was thus faced with a moment where he would have to choose some small risk to one audition on one very low budget job, and minor tension with his subordinate BORDO, to simply stand up for FREEDMAN and tell BORDO to cancel Serfaty for this one audition;

   f.  But, the story had not come out yet and it kept being delayed and D'ALESSIO'S fragile moral courage collapsed completely.

210.  D'ALESSIO decided to side with BORDO and Serfaty and shun FREEDMAN, and began actively executing that decision.  First, D'ALESSIO went to Miller and informed Miller that FREEDMAN was not to be used on the December 5 Indian Job, and, PLAINTIFF is informed and believes and on that basis alleges, on any further jobs without consulting D'ALESSIO.  Next, D'ALESSIO texted FREEDMAN and told her (falsely) that they had "booked Serfaty" (committed to Serfaty) for the December 5 Indian Job and that D'ALESSIO was therefore excluding FREEDMAN from not only the November 30 audition work, but from the December 5 Indian Job altogether.  D'ALESSIO further falsely stated to FREEDMAN that he was excluding FREEDMAN "for her own good," or words to that effect.

211.  FREEDMAN felt shocked and betrayed by D'ALESSIO'S turnabout. FREEDMAN remained professional and resolute nonetheless, but did text one request to D'ALESSIO: "When you guys are on set with Jessica, please don't let my name be brought up.  She's already working with his [Westwick's] lawyers in defense of him and trying to make me look bad."  D'ALESSIO and the defendants failed to honor even that humble request from FREEDMAN.

212.  With Westwick and Serfaty's team actively raging against FREEDMAN to Publication X, Serfaty came into FREEDMAN'S RYDE STUDIOS/Kat & Bare business offices in person on both November 30, 2017 and December 5, 2017, invited first by BORDO, with D'ALESSIO'S rapid acquiescence and ratification.  Based on various communications in the diligence process and their timing relative to Serfaty's presence at Kat & Bare, and later admissions to FREEDMAN by D'ALESSIO, the

following occurred around Serfaty's BORDO-manipulated November 30, 2017 "audition" and through and including the December 5 Indian Job shoot itself:

    a.  Purportedly in connection with the November 30 audition and/or the December 5 Indian Job, Serfaty began actively querying various staff for facts about FREEDMAN, including FREEDMAN'S then-current whereabouts and situation;

    b.  Very few people knew that FREEDMAN was in medical treatment between November 27 and December 1, and Serfaty and Westwick and their teams did not know;

    c.  D'ALESSIO saw Serfaty ask BORDO where FREEDMAN was, and also saw that BORDO was giving Serfaty answers.

213.  Whether BORDO gave the information to Serfaty, or whether Serfaty came away with it in some other manner, PLAINTIFF is informed and believes and on that basis alleges that Serfaty's interactions with defendants in connection with the November 30, 2017 audition and the December 5 Indian Job resulted in Serfaty learning that FREEDMAN was spending or had spent the five days between November 27 and December 1 in medical treatment, including the name of FREEDMAN'S treatment facility.  Serfaty passed the information to the team tasked with crushing FREEDMAN to Publication X, who used it to cast FREEDMAN falsely as a drug addict either in rehabilitation or just out, none of which was or ever has been remotely true.  Although FREEDMAN was able readily to refute it once asked about it by Publication X, PLAINTIFF is informed and believes and on that basis alleges that the false drug addict/rehabilitation "fact" contributed to the overall avalanche of contrived mud that Westwick and Serfaty desperately pushed to Publication X to stall the story.

214.  Weeks later, D'ALESSIO would admit to FREEDMAN that he had seen BORDO and Serfaty talking to each other about FREEDMAN and her whereabouts in connection with either the November 30 audition or the December 5 Indian Job itself. However, in the afternoon of November 30, D'ALESSIO texted FREEDMAN that he

wanted to explain to FREEDMAN "this situation with Jessica." D'ALESSIO falsely informed FREEDMAN that he had decided to keep Serfaty on the job because the client "had fallen in love" with Serfaty (as a potential model for the shoot) (although PLAINTIFF is informed and believes and on that basis alleges that the client in fact had not yet made any such decision). D'ALESSIO thus confirmed that, purportedly as a result of the "client's" decision, D'ALESSIO was entirely excluding FREEDMAN from the December 5 Indian Job – for FREEDMAN'S own good, to "protect" FREEDMAN.

215.   In belated response to FREEDMAN'S earlier request to D'ALESSIO to be careful not to share any information about FREEDMAN with Serfaty, D'ALESSIO also disingenuously stated in the late afternoon or early evening of November 30 that he did not think Serfaty knew anything about the Westwick rape story, and then texted "And of course your business is your business and we would never bring up personal issues with anyone" – even though he had possibly just watched BORDO do so with Serfaty, and he knew that he had seen something of this nature.

216.   D'ALESSIO later admitted to FREEDMAN that he knew BORDO had done something terribly wrong to FREEDMAN by involving Serfaty and giving Serfaty information about FREEDMAN, but excused his own lack of fortitude in betraying FREEDMAN for the tiny assignment as a "necessary casualty" of the situation – an excuse and characterization he also applied to other despicable actions he took as he further abandoned and betrayed FREEDMAN as the story's publication remained slogged by Westwick and Serfaty's desperate mudslide.

### The Storm Continues – December 2017

217.   As Westwick and Serfaty continued to throw up false allegation after false allegation, and as Westwick bought time by switching legal teams and asking for more time for new lawyers to prepare and respond, all of December came and went with the story's publication still in a fact-checking diligence purgatory.

///

COMPLAINT

218.   In a surreal, self-fulfilling cycle of indecision, Publication X's own delay and internal hand-wringing about publishing the story or not itself cast a chill on FREEDMAN'S standing with her business partners, friends, industry colleagues and others, all of whom waited for Publication X's decision as an implicit stamp on FREEDMAN one way or the other.  If Publication X had the fortitude to print it, FREEDMAN would implicitly bear the stamp of courage and honesty, a validated herald of the #MeToo movement; but as time continued to pass and Publication X fretted and shuffled its feet about pulling the trigger in the face of Westwick's litigation thundering, and more and more days passed and no story came, the spectre of the opposite stamp started to loom in imaginations: that Publication X had determined FREEDMAN was a liar and attention seeker.  Or that she was even just a successfully crushed victim, regardless of what the truth about Westwick might or might not be.  In any case, the more the story's publication was delayed, the more FREEDMAN was a pariah to be avoided by any industry player who valued their own career.

219.   For most of December 2017, defendants behaved as if they thought of FREEDMAN in these terms, looking for ways to cut ties with her and evading their obligations towards her.  D'ALESSIO specifically knew that FREEDMAN had little or no money (because defendants had not paid her) and was struggling even to pay her rent.  Even though D'ALESSIO had promised FREEDMAN in writing as recently as November 29 that "we can pay you what we owe you for sure," in fact defendants did not pay FREEDMAN what they owe her for unpaid monthly fees.  They did not even cover their own bounced check to FREEDMAN for October 2017, and indeed they still haven't.  As D'ALESSIO said to FREEDMAN in his November 29 text, the truth was that the defendants certainly could have paid FREEDMAN at least what they owed her "for sure."  Indeed, as other RYDE STUDIOS staff were telling FREEDMAN at the time and since, the defendants were paying those other staff.  Just not FREEDMAN.

220.   PLAINTIFF is informed and believes and on that basis alleges that after the November 30 incident with Serfaty, and with the story publication continuing to

COMPLAINT

hang -- with its corresponding uncertainty as to whether FREEDMAN would be a recognized #MeToo herald or broken pariah -- D'ALESSIO discussed the situation with GIBBS.  PLAINTIFF is informed and believes and on that basis alleges that GIBBS convinced D'ALESSIO not to pay FREEDMAN.  Further, PLAINTIFF is informed and believes and on that basis alleges that GIBBS and D'ALESSIO further agreed together to tell FREEDMAN that the defendants had no money to pay.  However, FREEDMAN was and is aware from communications with other RYDE STUDIO workers that in fact even as of November 30, defendants were paying other staff.  PLAINTIFF is informed and believes and on that basis alleges that as of the filing of this Complaint, defendants have paid all other staff, except FREEDMAN, all amounts due, including backpay.

221.   D'ALESSIO also throttled the shunning machine into full force against FREEDMAN.  Since November 21, 2017, as addressed above, BORDO had excluded FREEDMAN from all (or all meaningful) email communications about the business, while at the same time continuing to use FREEDMAN'S contact lists to find resources and talent for shoots.  PLAINTIFF is informed and believes and on that basis alleges that from at least November 30, 2017 forward, D'ALESSIO ratified and even instructed the email blackout to FREEDMAN to continue, and that he has never lifted it.

222.   As the next step in the shunning playbook, D'ALESSIO struck FREEDMAN off of the metaphorical business chalkboard of future work.  Although D'ALESSIO knew that the December "gig work" for Cabi and the December 5 Indian Job might be FREEDMAN'S only source of income in a time of desperate need for her, including over the holidays, D'ALESSIO actively excluded FREEDMAN from both jobs.  PLAINTIFF is informed and believes and on that basis alleges that D'ALESSIO told the other defendants and other RYDE STUDIOS staff that FREEDMAN was out of the picture (not to be used for work projects), until further notice.

223.   On or about December 5, 2017, the Publication X journalist informed FREEDMAN that the story had been "cleared" by the publication's attorneys, and that

the story was now being provided to WESTWICK's attorneys to give WESTWICK one last chance to comment.

224.  In or around December 7, 2017, Miller reached out to FREEDMAN to inform her that RYDE STUDIOS could cut her a reimbursement check for her incurred expenses, and asked her to come to RYDE STUDIOS to pick it up, but FREEDMAN requested that it be mailed.  FREEDMAN did receive this reimbursement check.  But Publication X delayed yet again, and in the now familiar pattern, any more checks to FREEDMAN were also delayed yet again (and indeed have never come).

225.  A few days later, on or about December 11, 2017, the Publication X journalist informed FREEDMAN that the editor for Publication X was now holding the story off, having received threats from WESTWICK's United Kingdom attorneys to sue if they published FREEDMAN's story.  The Publication X journalist expressed to FREEDMAN that he still believed that the story would be published soon.

226.  On or about December 14, 2017, the Publication X journalist followed up with FREEDMAN, and expressly reaffirmed that Serfaty had been and was (still) working with Westwick and his team on discrediting FREEDMAN and generally smearing her to attempt to kill the story.  Westwick's lawyers were still making threats, and the editor was continuing to hold the story back from being published out of fear of expensive litigation defense, even if the story were true and even if any suit by Westwick would ultimately be doomed to fail.

227.  PLAINTIFF is informed and believes and on that basis alleges that between on or about December 5, 2017 and December 20, 2017, with Publication X still under intense pressure and threats from Westwick and Serfaty and publication of the story still hanging, D'ALESSIO made plans to take the first of the Asia trips that he had promised to take with FREEDMAN.  And, deep now in the pages of the shunning playbook, and with his internal needle pointing more strongly to FREEDMAN as a possible pariah, he left FREEDMAN out of the trip that he knew she had worked so hard for and had pinned so many hopes on.

COMPLAINT

228.  PLAINTIFF is informed and believes and thereon alleges that by the time the winter holidays arrived with the story still unpublished, defendants came to believe that it never would be.  But at the same time, no visible industry thunderbolt of condemnation had hit FREEDMAN either (at least not from anyone other than Westwick, Serfaty and the defendants themselves).  As the information now looks to PLAINTIFF and as she now alleges on information, D'ALESSIO began to think it was all over and that FREEDMAN might no longer be the industry equivalent of radioactive.

229.  Between December 20 and 23, 2017, while on one of the Asia trips (now without FREEDMAN), and with the buffer of literally half a world of actual geographical distance between himself and FREEDMAN, D'ALESSIO attempted to re-establish communication with FREEDMAN by text.  D'ALESSIO updated FREEDMAN that several of the projects that FREEDMAN had worked to develop and pitch were either affirmatively going forward or likely to come to fruition soon. D'ALESSIO further attempted to elicit FREEDMAN'S response and find her mood by telling FREEDMAN that BORDO would be away in Israel for several months (shooting her documentary film).

230.  On or about December 26, 2017, D'ALESSIO and FREEDMAN engaged in an extended back and forth by text, with D'ALESSIO in Asia and FREEDMAN here in Southern California.  D'ALESSIO essentially admitted that he had shaded multiple things to FREEDMAN and had excluded her intentionally and was feeling badly about that.  He blamed much of it on BORDO as the true villain in helping Serfaty claw at FREEDMAN and in BORDO herself denigrating FREEDMAN to D'ALESSIO.  And D'ALESSIO rationalized his own behavior as to a degree inevitable – that in a situation like FREEDMAN'S there would "always be casualties."  D'ALESSIO at least partially apologized to FREEDMAN, essentially asked her forgiveness and encouraged her to resume work as his partner in "Kat & Bare 2.0" when D'ALESSIO returned from Asia in mid-January or so.

231.   FREEDMAN gave D'ALESSIO extended and candid responses, letting him know that D'ALESSIO had let her down deeply, but telling him that she appreciated the apology.  FREEDMAN confessed to D'ALESSIO that for a long time, what she had really most wanted to do related to the Kat & Bare Venture was to work with D'ALESSIO as his creative partner and to learn how to do what he does in the commercial directing world, where D'ALESSIO is indeed a true master of the medium. FREEDMAN told D'ALESSIO she would at least think about it.

232.   Then FREEDMAN just asked again for the defendants to pay her the outstanding payments that she was owed.  And they didn't, even as FREEDMAN knew they were paying others (indeed, PLAINTIFF is informed and believes and thereon alleges, they were paying everyone except FREEDMAN).  And worse, GIBBS made clear that the defendants were never going to acknowledge that FREEDMAN was their partner or more than a mere independent contractor.  Indeed, GIBBS and the defendants soon made clear that they intended to continue to be dishonest with FREEDMAN about basic issues.

### *2018*

233.   The holidays went on, and for a little while people thought less about hanging #MeToo stories.  And then the holidays ended and 2018 came.  And surprisingly perhaps, for a window from about January 8, 2018 to January 12, 2018, Publication X let FREEDMAN know that it still might publish the story – it was still alive.

234.   And coincidentally or not, the shunning playbook was still on by the defendants, or back on, and they were otherwise back to their shady behavior toward FREEDMAN.  By January 10, 2018, FREEDMAN still had not received any of her outstanding and owed monthly pay checks, going back by then more than three months all the way to and including half of October 2017 (and she never has received them). Defendants had still not even covered the October 2017 bounced check to FREEDMAN (and they still never have).  So, on January 10, 2018, FREEDMAN texted GIBBS with

the simple question as to what the ETA was on the checks.  When a day went by and GIBBS did not respond, FREEDMAN texted him again and asked "could you please send me a copy of my employee contract [meaning the vague "Art Director – Contract" document that GIBBS had provided FREEDMAN in or about September]? Thanks."

235.  GIBBS finally responded, apologizing for the delay and informing FREEDMAN that RYDE STUDIOS was still "working on it" as to the checks and that FREEDMAN was "at the top of the list" to be paid when money came in (even though PLAINTIFF is informed and believes that other staff were already being paid by that time, if they ever stopped being paid).  As to FREEDMAN'S request for a copy of her "employee contract," GIBBS texted back "What we presented you wasn't a contract but a job description with your rate."  GIBBS then failed and refused to send FREEDMAN the document at all, whatever he wanted to say it might or might not be.

236.  No paychecks came, and in or around late January 2018, FREEDMAN learned that RYDE STUDIOS was soliciting models and other talent for upcoming shoots.  At or around this time, FREEDMAN also discovered a job posting on Indeed.com by RYDE STUDIOS seeking a sales representative – the defendants were making new hires.  Still no paychecks came to FREEDMAN from the defendants.  And the email blackout was still on, too.  Except for two new emails: emails from GIBBS to FREEDMAN telling her that she had only *ever* been a mere independent contractor for defendants, and could she please sign acknowledge that by signing and returning a W-9 (even though defendants already had a signed W-9) for FREEDMAN.  If FREEDMAN could agree to all that and acknowledge it, GIBBS maybe could send her the back paychecks soon.

237.  FREEDMAN simply remained silent.  No paychecks came.  D'ALESSIO texted FREEDMAN on or about January 11, 2018 to let her know that he had finally returned from Asia.  D'ALESSIO could have caused GIBBS and defendants to pay FREEDMAN the money that she had been requested for months.  But D'ALESSIO ///

COMPLAINT

didn't.  Still no paychecks came, and still FREEDMAN was on email blackout on project castings.

238.   On or about February 1, 2018, FREEDMAN noticed that there was a new post on the Kat & Bare Venture's Instagram page – the first post in which FREEDMAN had no involvement.  Clearly, work was happening at Kat & Bare.  Business was being done.  But still no paychecks came.

239.   By this time, the Publication X journalist had communicated to FREEDMAN that the story had gone into what everyone now knew was a likely permanent deep freeze and would probably never be published.  As the account was related to FREEDMAN, over the holidays, Westwick had retained an Irish lawyer, hoping to leverage what Westwick perceived to be more prohibitive Irish privacy laws to magnify his attempts to discredit FREEDMAN.  And, Westwick's team claimed that they had "found" travel receipts purporting to show that in August 2014, the time of the rape, some of Westwick's relatives had traveled to Los Angeles from abroad – somehow proving that if Westwick had relatives in town in August 2014, he somehow could not have raped FREEDMAN then.  Finally, Westwick's team declined to provide the alleged receipts for any pre-publication review, saying they would hold them to use against Publication X in post-publication litigation in Ireland – daring Publication X to call the bluff or not.

240.   And there the Westwick-Publication X stalemate remains frozen, the story still unpublished.  PLAINTIFF is informed and believes and on that basis alleges that either no such purportedly exculpatory travel receipts exist at all, or, if they do exist, they do not in any way actually exculpate Westwick regarding raping FREEDMAN (indeed, the Glendower Estate is very large, with many rooms, and Westwick kept PLAINTIFF captive in his bedroom for almost the entirety of the time PLANTIFF was at the residence – Westwick relatives could have been in other parts of the residence or not and PLAINTIFF would not necessarily know, nor would the relatives know of PLAINTIFF'S presence).  PLAINTIFF is informed and believes and on that basis

COMPLAINT

alleges that Publication X never made any determination that FREEDMAN was not credible or absolving Westwick, but rather Westwick's and Serfaty's efforts had just made things take so long and take up so many of Publication X's resources, that the editor and publisher had just moved the story back out of active consideration as taking more time effort than the story was worth.  And once the story moved off of active consideration, it was unlikely ever to be printed.  This was Westwick's and Serfaty's strategy all along, and now they had won.

### *Freedman's Partnership, Authorship, and Ownership in the Kat & Bare Venture*

241.  As to the defendants, PLAINTIFF is informed and believes and on this basis alleges that they in fact did receive investment funding or otherwise have relatively ample funds, or certainly enough to pay FREEDMAN (and, indeed, that they have paid everyone else except her).  PLAINTIFF is further informed and believes and on that basis alleges that defendants are using their liquidity to move forward on Kat & Bare and on other projects -- but without FREEDMAN.

242.  As for FREEDMAN, less than a year ago, she was a rising star in the stylist and fashion consultant community, making a good living on her own, and moving steadily toward realization of her dream of becoming a creative director by the age of thirty.  Now, after trusting the defendants in business, and trusting their advice and purported support about telling her #MeToo story, FREEDMAN doesn't have a job at all.  Unless she wants to agree that she was never a partner in the Venture or anything more than a mere independent contractor that worked for the defendants for the better half of 2017; that she gave up her entire promising stylist and fashion consultant career; and that she gave all of her valuable business contacts to the defendants; and did all that just for a monthly cash fee that was a fraction of what FREEDMAN was able to make on her own before she ever met the defendants.

243.  FREEDMAN declines to abandon her partnership and/or other interests in the Venture in that way, and the defendants are going to have to deal with her about the fact that not only is she a partner, and not only is she owed the monthly fees she was

promised, and payment for the bounced checks, but, especially if FREEDMAN was never defendants' employee, then she is at least a part owner of all or most of the Venture's and some of the larger RYDE STUDIOS' intellectual property.  And maybe some of D'ALESSIO'S commercial directing projects, too.  Because she is at least a joint author of all of these works under copyright law.

244.   PLAINTIFF is informed and believes and on that basis alleges that the named defendants all contend that PLAINTIFF was not an employee of any of the named defendants at any time, and PLAINTIFF herein alleges that (in the alternative to her allegations that she was an employee of some or all of the named defendants), that PLAINTIFF was not an employee of any of the named defendants at any time.

245.   There was never any copyright work for hire agreement between FREEDMAN and any of the named defendants at any time.

246.   As discussed throughout, FREEDMAN made material creative contributions to the creative works that she generated for and with the named defendants.  On all creative projects, both for projects under the Kat & Bare Venture and for other commercial projects, D'ALESSIO and FREEDMAN took the creative lead and worked together as creative partners.  It was clear between both of D'ALESSIO and FREEDMAN that they were creative partners, and all of the defendants so understood.  FREEDMAN was involved in and had a creative leadership and authorship role in almost every project under the Kat & Bare Venture from May 2017 to November 2017, and contributed in material creative ways to all or most parts of the process, from creating the development decks and color stories through to working on a shoot's post-production processing.

247.   Accordingly, FREEDMAN was at least a co-author or co-creator under copyright law for a substantial number of copyrightable works done in connection with the Kat & Bare Venture and/or with D'ALESSIO from May 2017 to November 2017.  FREEDMAN was and is a creator or co-creator, and author or co-author under copyright law, for a substantial number of editorial projects done for the Kat & Bare

Venture, including for many (even most) of the photos and videos posted on @katandbare from June 1, 2017 (when RYDE STUDIOS uploaded its first post) to December 31, 2017, and FREEDMAN holds intellectual property rights, including copyrights, in a substantial number of works created under the Kat & Bare Venture.

248.   Attached hereto as **Exhibit A** and incorporated herein by reference is a screenshot of the @katandbare Instagram page as of on or about February 2, 2018. FREEDMAN was and is a co-author of each and every video, photograph and post specifically marked, as further detailed below in FREEDMAN'S first claim for relief.

249.   In addition, FREEDMAN made material creative contributions as a joint author to the look, feel, and organization of the entire overall @katandbare Instagram page or feed (at the very least as it appeared through and until November 2017), and FREEDMAN is thus a co-author and co-owner of the copyright in the Instagram page or feed as a compilation work.

250.   Throughout her time working with the named defendants, FREEDMAN not only worked on commercial projects for clients or for individual Kat & Bare shoots, but she also worked with D'ALESSIO on building the overarching Kat & Bare channel concept, passing back and forth between them a master creative deck that they develop on an ongoing basis with a goal of eventually using it to pitch the Kat & Bare Venture to clients.   FREEDMAN is a co-author or joint author, and thus copyright co-owner with D'ALESSIO of the Kat&Bare master creative deck, and of many other creative decks that defendants used or are still using.

251.   Defendants have a duty to account to PLAINTIFF with respect to their exploitation of all of these works and they have failed to do so.

252.   Under California partnership law and the facts here, FREEDMAN was and is also a general partner of the Kat & Bare Venture, and the defendants as her co-partners owe FREEDMAN various duties, including a fiduciary duty to account to her about the Venture's business and finances generally.   They haven't.

///

COMPLAINT

253.   In the alternative, if PLAINTIFF was "just" the defendants' employee, then all of the defendants, or certainly at least some of them, have committed numerous egregious ongoing violation of various laws and regulations in place for the protection of employees, including provisions of the California Labor Code and Government Code.

254.   It also appears likely now that defendants may have simply defrauded PLAINTIFF from the outset, or that some of them intended to so from the outset, and the others ultimately ratified that fraudulent conduct.

255.   Under any scenario, defendants have a lot to answer for to FREEDMAN, and they don't seem to want to.  PLAINTIFF thus now seeks relief from this Court.

## FIRST CLAIM FOR RELIEF

### DECLARATORY JUDGMENT AND ACCOUNTING PURSUANT TO THE COPYRIGHT ACT

*(Against All Defendants)*

256.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

257.   To the extent any of the allegations or theories in this First Claim for Relief are inconsistent with other allegations or theories plead in this Complaint, they are plead in the alternative.

258.   Attached hereto as **Exhibit A** is a true and correct copy of a screen capture of the Instagram feed or page for @katandbare as that feed or page appeared on or about February 1, 2018.  As captured in Exhibit A, the @katandbare Instagram page or feed includes 158 photographs, photographic albums (or "swipe posts," *i.e.*, multi-photo posts) and videos that the Kat & Bare Venture posted to Instagram between on or about June 1, 2017 and February 1, 2018, inclusive.

259.   Each of the photographs depicted in Exhibit A, including each of the individual photographs within each of the photographic albums or swipe posts, is

COMPLAINT

within the definition of "pictorial, graphic or sculptural works" under 17 U.S.C. section 101, and each is a copyrightable and copyrighted work ("Kat and Bare Posted Photographs").  For most or all of the Kat and Bare Posted Photographs, there exist additional photographs taken at the same photographic shoot, but which have not been posted on @katandbare and/or have been archived on Instagram or subsequently deleted from the @katandbare Instagram page, such that the photographs are not depicted on Exhibit A (the "Unpublished Kat and Bare Photographs").  PLAINTIFF is either the sole author, or at least a joint author, of each of the Kat and Bare Posted Photographs, and the corresponding Unpublished Kat and Bare Photographs, for those photographs marked on Exhibit A with a blue X.  PLAINTIFF is a joint author of each of the Kat and Bare Posted Photographs, and the corresponding Unpublished Kat and Bare Photographs, marked on Exhibit A with a blue X bisected by a yellow line. Together, the marked Kat and Bare Posted Photographs and the corresponding Unpublished Kat and Bare Photographs (the photographs in which PLAINTIFF claims sole or joint authorship) are referred to herein as the "Claimed Photographs."

260.   Each of the videos depicted in Exhibit A is within the definition of "audiovisual work" under 17 U.S.C. section 101, and each is a copyrightable and copyrighted work ("Kat and Bare Posted Videos").  For most or all of the Kat and Bare Posted Videos, there exist additional video footage, edits or cuts taken at the same video shoot, but which have not been posted on @katandbare and/or have been archived on Instagram or subsequently deleted from the @katandbare Instagram page, such that the videos are not depicted on Exhibit A ("Unpublished Kat and Bare Videos").  PLAINTIFF is either the sole author, or at least a joint author, of each of the Kat and Bare Posted Videos, and the corresponding Unpublished Kat and Bare Videos, for those videos marked on Exhibit A with a blue X.  PLAINTIFF is a joint author of each of the Kat and Bare Posted Videos, and the corresponding Unpublished Kat and Bare Videos, marked on Exhibit A with a blue X bisected by a yellow line.  Together, the marked Kat and Bare Posted Videos and the corresponding Unpublished Kat and

- 80 -

COMPLAINT

Bare Videos (the videos in which PLAINTIFF claims sole or joint authorship) are referred to herein as the "Claimed Videos."

261.  The entire Instagram page or feed of @katandbare is a "compilation" within the definition of 17 U.S.C. section 101, and is a copyrightable and copyrighted work ("Exhibit A Kat and Bare Instagram Feed").  PLAINTIFF is a joint author of the Kat and Bare Instagram Feed.

262.  Each new iteration of the Instagram page or feed of @katandbare, as posts are added, is a "derivative work" of the Exhibit A Kat and Bare Instagram Feed, and also itself a "compilation," all within said definitions under 17 U.S.C. section 101, and is a copyrightable and copyright work ("Kat and Bare Instagram Page Iterations"). PLAINTIFF is a joint author of the Kat and Bare Instagram Page Iterations, or otherwise entitled to an accounting regarding them, as derivative works of works in which PLAINTIFF is the sole or a joint author.

263.  Visual presentation decks (*e.g.*, PowerPoint or Keynote decks) are copyrighted or copyrightable works within one or more categories of "works" as defined in 17 U.S.C. section 101.  PLAINTIFF is the sole author or at least a joint author of at least the following decks (all of the together here "Freedman Decks"):

   a.  "Kat&Bare No. 1: June Issue Creative Brief" (and iterations thereof)

   b.  "Kat&Bare No. 2: July Issue Creative Brief" (and iterations thereof)

   c.  "Kat&Bare Models Eat" (and iterations thereof)

   d.  "Kat&Bare No. 3: August Issue Creative Brief" (and iterations thereof)

   e.  "Kat&Bare No. 4: September Creative Brief" (and iterations thereof)

   f.  "Kat&Bare No. 5: Issue Creative Brief" (October Creative Brief) (and iterations thereof)

   g.  "Tomorrow Networks October 11, 2017" (and iterations thereof)

   h.  "Kat&Bare No. X: Issue Creative Brief" (November Creative Brief) (and iterations thereof)

   i.  "Vivo 7Plus"

264.   Together, the Freedman Decks, the Claimed Photographs, Claimed Videos, Exhibit A Kat and Bare Instagram Feed, and the Kat and Bare Instagram Page Iterations are referred to herein as the "Claimed Works."

265.   PLAINTIFF did not create the above works as the employee of any person or entity or as works made-for-hire.  PLAINTIFF has never assigned or transferred to any person any of her ownership interest in and to any of the Claimed Works. Therefore, pursuant to the Copyright Act, PLAINTIFF is the owner or co-owner of the copyrights in and to the Claimed Works as a consequence of her sole authorship or joint authorship.  In the alternative, PLAINTIFF is the co-owner of the copyright in and to the Claimed Works by operation of law, in that each such copyright is a partnership asset.

266.   PLAINTIFF is informed and believes and on that basis alleges that each of the defendants disputes that PLAINTIFF is the owner or co-owner of some or all of the Claimed Works.

267.   There exists a real controversy between PLAINTIFF and defendants as to the true ownership over the Claimed Works, and this controversy is dependent on an interpretation of § 201 of the Copyright Act of 1976, and the decision law interpreting that statute.

268.   By this action, PLAINTIFF prays that she be adjudicated as the sole author and sole owner of a one hundred percent (100%) interest, or co-author and co-owner of an undivided partial interest, in and to the copyright in each of the Claimed Works.  In addition, to the extent that any defendants have received any proceeds or revenues from the Claimed Works, PLAINTIFF seeks an accounting of said proceeds or revenues in the event that any defendants have received any of PLAINTIFF'S share of the fruits or proceeds of each of the Claimed Works.

///

///

///

COMPLAINT

**SECOND CLAIM FOR RELIEF**

**DECLARATORY JUDGMENT UNDER THE CALIFORNIA REVISED UNIFORM PARTNERSHIP ACT, CAL. CORP. CODE § 16100 *et seq.***

***(Against Defendants Nicolas Gibbs, Richard D'Alessio, Becky Tahel Bordo, Ryde Studios, LLC and Does 1-10)***

269.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

270.   To the extent any of the allegations or theories in this Second Claim for Relief are inconsistent with other allegations or theories plead in this Complaint, they are plead in the alternative.

271.   Pursuant to Cal. Corp. Code § 16101 (the "California Revised Uniform Partnership Act of 1994" or "the California Partnership Act"), the business arrangement of PLAINTIFF, GIBBS, D'ALESSIO, and BORDO (and possibly RYDE STUDIOS) constitutes a partnership, which is the Kat & Bare Venture.  While the partnership did not have a definitive term, the partners agreed that the Kat & Bare Venture would remain in existence at least as long as RYDE STUDIOS could support it and as it was carrying on the business of Kat & Bare, including without limitation the Instagram page or magazine @katandbare.

272.   PLAINTIFF has performed all conditions, covenants, and promises required to be performed by her in accordance with the partnership agreement and/or the California Partnership Act.

273.   PLAINTIFF, at this time, remains a partner of the Kat & Bare Venture, because there has been no event that would cause PLAINTIFF'S disassociation from the Kat & Bare Venture, under Cal. Corp. Code § 16601, and specifically, the attempted expulsion of PLAINTIFF was not pursuant to the partnership agreement, under Cal. Corp. Code § 16601(3).

274.   Furthermore, there has been no event under § 16801 that would cause the partnership to be dissolved or wound up.

COMPLAINT

275.   Therefore, PLAINTIFF seeks a judicial declaration that she remains a partner of the Kat & Bare Venture, and is entitled to share in the profits of the partnership, including but not limited to all profits from the assets of the partnership that have been created so far.  A declaratory judgment from this Court is necessary, because PLAINTIFF maintains she is a full partner of the Kat & Bare Venture, while Defendants have taken the position that PLAINTIFF is not a partner and not entitled to any such profits or proceeds, but rather is a mere independent contractor with no partnership or equity interests.

### THIRD CLAIM FOR RELIEF

### BREACH OF CONTRACT

### (Against Defendant Ryde Studios, LLC dba Ryde Studios and dba Kat & Bare, Richard D'Alessio and Doe 1)

276.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

277.   To the extent any of the allegations or theories in this Third Claim for Relief are inconsistent with other allegations or theories plead in this Complaint, they are plead in the alternative.

278.   In or about May 2017, and as subsequently modified by the parties, PLAINTIFF entered into a valid and enforceable oral contract or implied-in-fact contract with defendant RYDE STUDIOS (and/or with the other defendants to this claim for relief, either as the alter egos of RYDE STUDIOS, or as themselves the contracting party or parties with PLAINTIFF) with at least the following essential terms:

    a.   PLAINTIFF would make herself available to perform and would services for defendants as a stylist, art director, and other creative and business services on essentially at least a full-time basis, including PLAINTIFF ceasing to pursue her independent stylist and fashion consultant work for other clients, after finishing a small set of projects for such clients;

COMPLAINT

b. PLAINTIFF would contribute her business contacts for defendants' use in the work of the Venture, including at least PLAINTIFF'S contacts with models, influencers, model and influencer representatives, and hair and makeup teams;

c. PLAINTIFF would leverage or facilitate defendants in leveraging PLAINTIFF'S established good will in the industry and with the public, including PLAINTIFF'S Instagram following of tens of thousands of followers for the development and benefit of the Venture;

d. PLAINTIFF would facilitate defendants' in establishing business relationships with models, influencers, photographers, talent representatives, hair and makeup teams and other resources, for the purpose of building RYDE STUDIOS and the Venture;

e. RYDE STUDIOS would hire PLAINTIFF on a full-time basis;

f. As a portion of her compensation, defendants would pay PLAINTIFF a monthly cash fee that started as $1,500.00 for a portion of May 2017, increased to $3,500.00 a month for June, July and August, and later increased to $4,500.00 per month starting September 2017 and guaranteed through at least December 31, 2017;

g. Defendants would not terminate PLAINTIFF or exclude her from the business without good cause;

h. PLAINTIFF was to receive an equity interest in RYDE STUDIOS and/or the Venture, and RYDE STUDIOS promised to provide an equity package for PLAINTIFF's review;

i. A significant part of PLAINTIFF's duties as Art Director was to launch the Kat & Bare Venture and build Kat & Bare as a brand, channel, and platform and including in consideration of the performance of these duties, FREEDMAN was to be a full partner with GIBBS, D'ALESSIO and/or BORDO in the Kat & Bare Venture;

COMPLAINT

j. PLAINTIFF was to hold the title of Art Director for RYDE STUDIOS and the Venture, and the title was to be not merely nominal, but PLAINTIFF was in fact to serve as Art Director for RYDE STUDIOS and the Venture;

k. The contract contained no work made for hire provision relating to intellectual property and none was ever discussed;

l. Defendants were to provide PLAINTIFF with opportunities to work closely with D'ALESSIO on projects, including without limitation on commercial directing projects outside the fashion industry, so that PLAINTIFF could learn the commercial directing profession, qualify for DGA membership and corresponding health benefits, earn credits on commercial directing projects, and earn fees specific to commercial projects;

m. PLAINTIFF was to receive individual credit for her creative work, including in on-post tags;

n. Defendants would treat PLAINTIFF as a partner and keep her informed and account to her as to the state of the business, financial performance, business opportunities, and other aspects of the business and would not exclude PLAINTIFF or keep substantial business secrets from her;

o. Defendants would treat PLAINTIFF'S pre-existing business relationships with care such that PLAINTIFF'S relationships and reputation would not be unduly damaged by PLAINTIFF connecting Defendants with PLAINTIFF'S contacts and resources.

279. To the extent any portion of the contract is or was invalid or unenforceable, the remaining portions of the contract are severable such that PLAINTIFF had and has a valid and enforceable contract with RYDE STUDIOS.

280. PLAINTIFF completely or substantially performed all conditions, covenants and promises required on her part to be performed in accordance with the

- 86 -

contract, except to the extent that such obligations have been excused or defendants prevented PLAINTIFF from performing them, and all conditions precedent to defendant's obligations that PLAINTIFF seeks to enforce herein have either been satisfied, excused or waived.

281.   Within the last two years, defendants materially breached the contract with PLAINTIFF in at least the following ways:

a.   Failing and refusing to pay PLAINTIFF her monthly cash compensation of $4,500.00/month since mid-October 2017, and through at least December 31, 2017, with amounts owing for this item of compensation totaling at least $11,250.00;

b.   Failing to provide FREEDMAN with work on commercial directing projects, both to qualify for DGA membership and for fees, credits and experience;

c.   Failing to provide FREEDMAN with any equity package in RYDE STUDIOS and/or the Venture;

d.   Actually or constructively terminating FREEDMAN's contractual relationship with RYDE STUDIOS without good cause, and worse, due to PLAINTIFF's act of disclose her felony rape and false imprisonment by Westwick;

e.   Actually or constructively terminating FREEDMAN's partnership relationship with the Kat & Bare Venture and denying her partnership status in the Kat & Bare Venture;

f.   Failing or refusing to credit FREEDMAN appropriately for her creative work;

g.   Excluding FREEDMAN from business opportunities of RYDE STUDIOS and/or the Venture; and

h.   Failing to exercise appropriate and reasonable care in relating to FREEDMAN'S business contacts provided to the Venture.

282.   PLAINTIFF is informed and believes and thereon alleges that defendants' breaches damaged FREEDMAN in an amount to be proven at trial, but believed to be in excess of $100,000.

283.   PLAINTIFF is informed and believes and thereon alleges that during the operation of RYDE STUDIOS, the Venture, Doe 1 and D'ALESSIO'S commercial directing work, these three (or four) business entities (to the extent they are at all even claimed to be separate) shared many resources, such as office space, supplies and utilities.  The employees of RYDE STUDIOS provided services to the Venture and to D'ALESSIO and Doe 1, and vice versa.  PLAINTIFF is informed and believes and thereon alleges that at all times, D'ALESSIO held substantial ownership interests in each of these entities, and was an officer, director and/or managing member of each of them, such that D'ALESSIO has had the effective power and authority to control all three (or four) entities.

284.   PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO and/or Doe 1 caused the finances and other resources of all three (or four) entities to be intermingled and treated as one entity with the purpose of serving the needs, interests and desires of D'ALESSIO, in consistent and ongoing disregard for the corporate forms of the entities.  PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO caused or ratified business practices whereby the three (or four) entities failed to observe corporate formalities, including without limitation failing to keep minutes from board meetings and failing to notify shareholders and other equity holders of board meetings and failing to record the equity interests of both actual and promised equity holders, including PLAINTIFF.  PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO and Doe 1 conducted the business of the three (or four) entities for their own personal benefit, and at the expense of the entities and the entities' equity holders.  These acts demonstrate a unity of interest between D'ALESSIO and/or Doe 1 on the one hand, and RYDE STUDIOS and the Venture on the other hand, or among all of them, such that the legal fiction of these business

COMPLAINT

entities as separate legal entities ceases to exist.  Accordingly, any liability of D'ALESSIO, RYDE STUDIOS, the Venture and/or Doe 1 should be borne jointly and equally by each of them as if they were the same.

285.   Accordingly, either D'ALESSIO, the Venture and/or Doe 1 are the true contracting parties (or additional contracting parties) to the above described contract, or they are liable for the contractual obligations and breaches of RYDE STUDIOS as if they were, pursuant to alter ego doctrine.

286.   As a result of defendants' conduct, defendants are liable to PLAINTIFF for general damages, special damages, prejudgment interest, costs of suit, and such other relief as may be just.

## FOURTH CLAIM FOR RELIEF

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

*(Against Defendants Ryde Studios, LLC, Richard D'Alessio and Doe 1)*

287.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

288.   To the extent any of the allegations or theories in this Fourth Claim for Relief are inconsistent with other allegations or theories plead in this Complaint, they are plead in the alternative.

289.   In or about May 2017, and as subsequently modified by the parties, PLAINTIFF entered into a valid and enforceable oral contract or implied-in-fact contract with defendant RYDE STUDIOS (and/or with the other defendants to this claim for relief, either as the alter egos of RYDE STUDIOS, or as themselves the contracting party or parties with PLAINTIFF) with at least the following essential terms:

  a. PLAINTIFF would make herself available to perform and would services for defendants as a stylist, art director, and other creative and business services on essentially at least a full-time basis, including PLAINTIFF

- 89 -

ceasing to pursue her independent stylist and fashion consultant work for other clients, after finishing a small set of projects for such clients;

b. PLAINTIFF would contribute her business contacts for defendants' use in the work of the Venture, including at least PLAINTIFF'S contacts with models, influencers, model and influencer representatives, and hair and makeup teams;

c. PLAINTIFF would leverage or facilitate defendants in leveraging PLAINTIFF'S established good will in the industry and with the public, including PLAINTIFF'S Instagram following of tens of thousands of followers for the development and benefit of the Venture;

d. PLAINTIFF would facilitate defendants' in establishing business relationships with models, influencers, photographers, talent representatives, hair and makeup teams and other resources, for the purpose of building RYDE STUDIOS and the Venture;

e. RYDE STUDIOS would hire PLAINTIFF on a full-time basis;

f. As a portion of her compensation, defendants would pay PLAINTIFF a monthly cash fee that started as $1,500.00 for a portion of May 2017, increased to $3,500.00 a month for June, July and August, and later increased to $4,500.00 per month starting September 2017 and guaranteed through at least December 31, 2017;

g. Defendants would not terminate PLAINTIFF or exclude her from the business without good cause;

h. PLAINTIFF was to receive an equity interest in RYDE STUDIOS and/or the Venture, and RYDE STUDIOS promised to provide an equity package for PLAINTIFF's review;

i. A significant part of PLAINTIFF's duties as Art Director was to launch the Kat & Bare Venture and build Kat & Bare as a brand, channel, and platform and including in consideration of the performance of these duties,

COMPLAINT

FREEDMAN was to be a full partner with GIBBS, D'ALESSIO and/or BORDO in the Kat & Bare Venture;

j.  PLAINTIFF was to hold the title of Art Director for RYDE STUDIOS and the Venture, and the title was to be not merely nominal, but PLAINTIFF was in fact to serve as Art Director for RYDE STUDIOS and the Venture;

k.  The contract contained no work made for hire provision relating to intellectual property and none was ever discussed;

l.  Defendants were to provide PLAINTIFF with opportunities to work closely with D'ALESSIO on projects, including without limitation on commercial directing projects outside the fashion industry, so that PLAINTIFF could learn the commercial directing profession, qualify for DGA membership and corresponding health benefits, earn credits on commercial directing projects, and earn fees specific to commercial projects;

m. PLAINTIFF was to receive individual credit for her creative work, including in on-post tags;

n.  Defendants would treat PLAINTIFF as a partner and keep her informed and account to her as to the state of the business, financial performance, business opportunities, and other aspects of the business and would not exclude PLAINTIFF or keep substantial business secrets from her;

o.  Defendants would treat PLAINTIFF'S pre-existing business relationships with care such that PLAINTIFF'S relationships and reputation would not be unduly damaged by PLAINTIFF connecting Defendants with PLAINTIFF'S contacts and resources.

290.  To the extent any portion of the contract is or was invalid or unenforceable, the remaining portions of the contract are severable such that PLAINTIFF had and has a valid and enforceable contract with RYDE STUDIOS.

COMPLAINT

291.   In addition to all of the above terms, the contract also contained and was subject to the implied covenant of good faith and fair dealing applicable to all contracts governed by California law, as this contract was and is.

292.   PLAINTIFF completely or substantially performed all conditions, covenants and promises required on her part to be performed in accordance with the contract, except to the extent that such obligations have been excused or defendants prevented PLAINTIFF from performing them, and all conditions precedent to defendant's obligations that PLAINTIFF seeks to enforce herein have either been satisfied, excused or waived.

293.   Within the last two years, defendants materially breached the contract's implied covenant of good faith and fair dealing in at least the following ways:

      a. Failing and refusing to pay PLAINTIFF her monthly cash compensation of $4,500.00/month since mid-October 2017, and through at least December 31, 2017, with amounts owing for this item of compensation totaling at least $11,250.00;

      b. Failing to provide FREEDMAN with work on commercial directing projects, both to qualify for DGA membership and for fees, credits and experience;

      c. Failing to provide FREEDMAN with any equity package in RYDE STUDIOS and/or the Venture;

      d. Actually or constructively terminating FREEDMAN's contractual relationship with RYDE STUDIOS without good cause, and worse, due to PLAINTIFF's act of disclose her felony rape and false imprisonment by Westwick;

      e. Actually or constructively terminating FREEDMAN's partnership relationship with the Kat & Bare Venture and denying her partnership status in the Kat & Bare Venture;

      f. Failing or refusing to credit FREEDMAN appropriately for her creative

work;

g.  Excluding FREEDMAN from business opportunities of RYDE STUDIOS and/or the Venture; and

h.  Failing to exercise appropriate and reasonable care in relating to FREEDMAN'S business contacts provided to the Venture.

294.   PLAINTIFF is informed and believes and thereon alleges that defendants' breaches damaged FREEDMAN in an amount to be proven at trial, but believed to be in excess of $100,000.

295.   PLAINTIFF is informed and believes and thereon alleges that during the operation of RYDE STUDIOS, the Venture, Doe 1 and D'ALESSIO'S commercial directing work, these three (or four) business entities (to the extent they are at all even claimed to be separate) shared many resources, such as office space, supplies and utilities.  The employees of RYDE STUDIOS provided services to the Venture and to D'ALESSIO and Doe 1, and vice versa.  PLAINTIFF is informed and believes and thereon alleges that at all times, D'ALESSIO held substantial ownership interests in each of these entities, and was an officer, director and/or managing member of each of them, such that D'ALESSIO has had the effective power and authority to control all three (or four) entities.

296.   PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO and/or Doe 1 caused the finances and other resources of all three (or four) entities to be intermingled and treated as one entity with the purpose of serving the needs, interests and desires of D'ALESSIO, in consistent and ongoing disregard for the corporate forms of the entities.  PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO caused or ratified business practices whereby the three (or four) entities failed to observe corporate formalities, including without limitation failing to keep minutes from board meetings and failing to notify shareholders and other equity holders of board meetings and failing to record the equity interests of both actual and promised equity holders, including PLAINTIFF.  PLAINTIFF is informed and believes

COMPLAINT

and thereon alleges that D'ALESSIO and Doe 1 conducted the business of the three (or four) entities for their own personal benefit, and at the expense of the entities and the entities' equity holders.  These acts demonstrate a unity of interest between D'ALESSIO and/or Doe 1 on the one hand, and RYDE STUDIOS and the Venture on the other hand, or among all of them, such that the legal fiction of these business entities as separate legal entities ceases to exist.  Accordingly, any liability of D'ALESSIO, RYDE STUDIOS, the Venture and/or Doe 1 should be borne jointly and equally by each of them as if they were the same.

297.   Accordingly, either D'ALESSIO, the Venture and/or Doe 1 are the true contracting parties (or additional contracting parties) to the above described contract, or they are liable for the contractual obligations and breaches of RYDE STUDIOS as if they were, pursuant to alter ego doctrine.

298.   As a result of defendants' conduct, defendants are liable to PLAINTIFF for general damages, special damages, prejudgment interest, costs of suit, and such other relief as may be just.

## FIFTH CLAIM FOR RELIEF
### PROMISSORY ESTOPPEL
*(Against Defendants Ryde Studios, LLC, Richard D'Alessio and Doe 1)*

299.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

300.   To the extent any of the allegations or theories in this Fifth Claim for Relief are inconsistent with other allegations or theories plead in this Complaint, they are plead in the alternative.

301.   In or about May 2017, and as subsequently modified by the parties, D'ALESSIO, GIBBS (acting on behalf of one or more of the defendants to this claim for relief), and BORDO (acting on behalf of one or more of the defendants to this claim for relief), made clear and unambiguous promises to PLAINTIFF in presenting the following proposed bargain:

COMPLAINT

a. PLAINTIFF would make herself available to perform and would services for defendants as a stylist, art director, and other creative and business services on essentially at least a full-time basis, including PLAINTIFF ceasing to pursue her independent stylist and fashion consultant work for other clients, after finishing a small set of projects for such clients;

b. PLAINTIFF would contribute her business contacts for defendants' use in the work of the Venture, including at least PLAINTIFF'S contacts with models, influencers, model and influencer representatives, and hair and makeup teams;

c. PLAINTIFF would leverage or facilitate defendants in leveraging PLAINTIFF'S established good will in the industry and with the public, including PLAINTIFF'S Instagram following of tens of thousands of followers for the development and benefit of the Venture;

d. PLAINTIFF would facilitate defendants' in establishing business relationships with models, influencers, photographers, talent representatives, hair and makeup teams and other resources, for the purpose of building RYDE STUDIOS and the Venture;

e. RYDE STUDIOS would hire PLAINTIFF on a full-time basis;

f. As a portion of her compensation, defendants would pay PLAINTIFF a monthly cash fee that started as $1,500.00 for a portion of May 2017, increased to $3,500.00 a month for June, July and August, and later increased to $4,500.00 per month starting September 2017 and guaranteed through at least December 31, 2017;

g. Defendants would not terminate PLAINTIFF or exclude her from the business without good cause;

h. PLAINTIFF was to receive an equity interest in RYDE STUDIOS and/or the Venture, and RYDE STUDIOS promised to provide an equity package for PLAINTIFF's review;

COMPLAINT

i. A significant part of PLAINTIFF's duties as Art Director was to launch the Kat & Bare Venture and build Kat & Bare as a brand, channel, and platform and including in consideration of the performance of these duties, FREEDMAN was to be a full partner with GIBBS, D'ALESSIO and/or BORDO in the Kat & Bare Venture;

j. PLAINTIFF was to hold the title of Art Director for RYDE STUDIOS and the Venture, and the title was to be not merely nominal, but PLAINTIFF was in fact to serve as Art Director for RYDE STUDIOS and the Venture;

k. The contract contained no work made for hire provision relating to intellectual property and none was ever discussed;

l. Defendants were to provide PLAINTIFF with opportunities to work closely with D'ALESSIO on projects, including without limitation on commercial directing projects outside the fashion industry, so that PLAINTIFF could learn the commercial directing profession, qualify for DGA membership and corresponding health benefits, earn credits on commercial directing projects, and earn fees specific to commercial projects;

m. PLAINTIFF was to receive individual credit for her creative work, including in on-post tags;

n. Defendants would treat PLAINTIFF as a partner and keep her informed and account to her as to the state of the business, financial performance, business opportunities, and other aspects of the business and would not exclude PLAINTIFF or keep substantial business secrets from her;

o. Defendants would treat PLAINTIFF'S pre-existing business relationships with care such that PLAINTIFF'S relationships and reputation would not be unduly damaged by PLAINTIFF connecting Defendants with PLAINTIFF'S contacts and resources.

COMPLAINT

302. PLAINTIFF completely or substantially performed all conditions, covenants and promises required on her part to be performed in accordance with the contract, except to the extent that such obligations have been excused or defendants prevented PLAINTIFF from performing them, and all conditions precedent to defendant's obligations that PLAINTIFF seeks to enforce herein have either been satisfied, excused or waived.

303. Within the last two years, defendants materially breached their promises to PLAINTIFF in at least the following ways:

   a. Failing and refusing to pay PLAINTIFF her monthly cash compensation of $4,500.00/month since mid-October 2017, and through at least December 31, 2017, with amounts owing for this item of compensation totaling at least $11,250.00;

   b. Failing to provide FREEDMAN with work on commercial directing projects, both to qualify for DGA membership and for fees, credits and experience;

   c. Failing to provide FREEDMAN with any equity package in RYDE STUDIOS and/or the Venture;

   d. Actually or constructively terminating FREEDMAN's contractual relationship with RYDE STUDIOS without good cause, and worse, due to PLAINTIFF's act of disclose her felony rape and false imprisonment by Westwick;

   e. Actually or constructively terminating FREEDMAN's partnership relationship with the Kat & Bare Venture and denying her partnership status in the Kat & Bare Venture;

   f. Failing or refusing to credit FREEDMAN appropriately for her creative work;

   g. Excluding FREEDMAN from business opportunities of RYDE STUDIOS and/or the Venture; and

COMPLAINT

h.  Failing to exercise appropriate and reasonable care in relating to
FREEDMAN'S business contacts provided to the Venture.

304.   D'ALESSIO also specifically promised that if PLAINTIFF told her account of being raped by Westwick in 2014 to a reporter or otherwise publicized it, that D'ALESSIO, GIBBS, BORDO, RYDE STUDIOS and the Venture would both support PLAINTIFF emotionally, and specifically would not exclude PLAINTIFF from the business in any way or otherwise act to her detriment with respect to the business or her career and reputation, but instead would support her and be loyal to her.

305.   PLAINTIFF actually relied on defendants' promises in changing her position to her detriment, including by giving up her established and growing independent stylist and fashion consultant career, foregoing other opportunities, and in providing her valuable business contacts and industry and audience good will to defendants.  PLAINTIFF also specifically relied on the promises of D'ALESSIO regarding supporting and not shunning PLAINTIFF in PLAINTIFF'S decision to tell her Westwick rape story to a reporter and/or otherwise to publicize it, and the decision to do so materially changed PLAINTIFF'S position to her detriment, including with respect to her career and reputation in the industry, and her vulnerability within the business with defendants.

306.   PLAINTIFF'S reliance on the all of the above promises from defendants was reasonable and foreseeable, and indeed defendants made the promises to PLAINTIFF for the intended purpose of causing PLAINTIFF to rely on the promises substantially in the manner that she did.

307.   PLAINTIFF'S reliance on defendants' promises caused her substantial detriment, including without limitation in the form of giving up her independent stylist and fashion consultant career, as well as her valuable business contacts and relationships, and in telling her account of the 2014 Westwick rape to the press.  Had PLAINTIFF not acted in reliance on defendants' promises, PLAINTIFF is informed and believes and thereon alleges that PLAINTIFF was on track in her independent

COMPLAINT

career such that she would have earned at least $300,000 (at least $5,000 per week) over a two year period beginning on or about June 1, 2017 and continuing through on or about May 31, 2019 (and would have earned even higher amounts going forward). By relying on defendants' promises, PLAINTIFF gave up those career opportunities and that value and may never be able to recover them.

308.   Under these circumstances, injustice can only be avoided by enforcement of defendants' promises to PLAINTIFF.

309.   PLAINTIFF is informed and believes and thereon alleges that during the operation of RYDE STUDIOS, the Venture, Doe 1 and D'ALESSIO'S commercial directing work, these three (or four) business entities (to the extent they are at all even claimed to be separate) shared many resources, such as office space, supplies and utilities.  The employees of RYDE STUDIOS provided services to the Venture and to D'ALESSIO and Doe 1, and vice versa.  PLAINTIFF is informed and believes and thereon alleges that at all times, D'ALESSIO held substantial ownership interests in each of these entities, and was an officer, director and/or managing member of each of them, such that D'ALESSIO has had the effective power and authority to control all three (or four) entities.

310.   PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO and/or Doe 1 caused the finances and other resources of all three (or four) entities to be intermingled and treated as one entity with the purpose of serving the needs, interests and desires of D'ALESSIO, in consistent and ongoing disregard for the corporate forms of the entities.  PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO caused or ratified business practices whereby the three (or four) entities failed to observe corporate formalities, including without limitation failing to keep minutes from board meetings and failing to notify shareholders and other equity holders of board meetings and failing to record the equity interests of both actual and promised equity holders, including PLAINTIFF.  PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO and Doe 1 conducted the business of the three (or

four) entities for their own personal benefit, and at the expense of the entities and the entities' equity holders.  These acts demonstrate a unity of interest between D'ALESSIO and/or Doe 1 on the one hand, and RYDE STUDIOS and the Venture on the other hand, or among all of them, such that the legal fiction of these business entities as separate legal entities ceases to exist.  Accordingly, any liability of D'ALESSIO, RYDE STUDIOS, the Venture and/or Doe 1 should be borne jointly and equally by each of them as if they were the same.

311.   Accordingly, either D'ALESSIO, the Venture and/or Doe 1 are the true contracting parties (or additional contracting parties) to the above described contract, or they are liable for the obligations and breaches of RYDE STUDIOS as if they were, pursuant to alter ego doctrine.

312.   As a result of defendants' conduct, defendants are liable to PLAINTIFF for general damages, special damages, prejudgment interest, costs of suit, and such other relief as may be just.

## SIXTH CLAIM FOR RELIEF

### FRAUD

### (Against Defendants Ryde Studios, LLC, Nicolas Gibbs, Richard D'Alessio, Becky Tahel Bordo, and Does 1 through 4)

313.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

314.   To the extent any of the allegations or theories in this Sixth Claim for Relief are inconsistent with other allegations or theories plead in this Complaint, they are plead in the alternative.

315.   Within the last three years, Defendants RYDE STUDIOS, GIBBS, D'ALESSIO, BORDO and Does 1 through 4 made affirmative misrepresentations to PLAINTIFF, and/or suppressed and concealed facts from PLAINTIFF which they had a duty to disclose to PLAINTIFF under all the circumstances, and/or made promises without any intention of performing them, at least as follows:

COMPLAINT

316.   In or about May 2017, including in or about the week of May 8, 2017 at an in-person meeting at Imaginary Forces in Venice, California, and in subsequent oral, text and email communications between May 2017 and into December 2017, D'ALESSIO, GIBBS (acting on behalf of one or more of the defendants to this claim for relief), and BORDO (acting on behalf of one or more of the defendants to this claim for relief), made clear and unambiguous promises to PLAINTIFF in presenting the following proposed bargain:

    a. PLAINTIFF would make herself available to perform and would services for defendants as a stylist, art director, and other creative and business services on essentially at least a full-time basis, including PLAINTIFF ceasing to pursue her independent stylist and fashion consultant work for other clients, after finishing a small set of projects for such clients;

    b. PLAINTIFF would contribute her business contacts for defendants' use in the work of the Venture, including at least PLAINTIFF'S contacts with models, influencers, model and influencer representatives, and hair and makeup teams;

    c. PLAINTIFF would leverage or facilitate defendants in leveraging PLAINTIFF'S established good will in the industry and with the public, including PLAINTIFF'S Instagram following of tens of thousands of followers for the development and benefit of the Venture;

    d. PLAINTIFF would facilitate defendants' in establishing business relationships with models, influencers, photographers, talent representatives, hair and makeup teams and other resources, for the purpose of building RYDE STUDIOS and the Venture;

    e. RYDE STUDIOS would hire PLAINTIFF on a full-time basis;

    f. As a portion of her compensation, defendants would pay PLAINTIFF a monthly cash fee that started as $1,500.00 for a portion of May 2017, increased to $3,500.00 a month for June, July and August, and later

COMPLAINT

increased to $4,500.00 per month starting September 2017 and guaranteed through at least December 31, 2017;

g.  Defendants would not terminate PLAINTIFF or exclude her from the business without good cause;

h.  PLAINTIFF was to receive an equity interest in RYDE STUDIOS and/or the Venture, and RYDE STUDIOS promised to provide an equity package for PLAINTIFF's review;

i.  A significant part of PLAINTIFF's duties as Art Director was to launch the Kat & Bare Venture and build Kat & Bare as a brand, channel, and platform and including in consideration of the performance of these duties, FREEDMAN was to be a full partner with GIBBS, D'ALESSIO and/or BORDO in the Kat & Bare Venture;

j.  PLAINTIFF was to hold the title of Art Director for RYDE STUDIOS and the Venture, and the title was to be not merely nominal, but PLAINTIFF was in fact to serve as Art Director for RYDE STUDIOS and the Venture;

k.  The contract contained no work made for hire provision relating to intellectual property and none was ever discussed;

l.  Defendants were to provide PLAINTIFF with opportunities to work closely with D'ALESSIO on projects, including without limitation on commercial directing projects outside the fashion industry, so that PLAINTIFF could learn the commercial directing profession, qualify for DGA membership and corresponding health benefits, earn credits on commercial directing projects, and earn fees specific to commercial projects;

m. PLAINTIFF was to receive individual credit for her creative work, including in on-post tags;

n.  Defendants would treat PLAINTIFF as a partner and keep her informed

COMPLAINT

and account to her as to the state of the business, financial performance,
business opportunities, and other aspects of the business and would not
exclude PLAINTIFF or keep substantial business secrets from her;

o. Defendants would treat PLAINTIFF'S pre-existing business relationships
with care such that PLAINTIFF'S relationships and reputation would not
be unduly damaged by PLAINTIFF connecting Defendants with
PLAINTIFF'S contacts and resources.

317.   Including in or about late September 2017 and through to at least
November 30, 2017, including while D'ALESSIO and PLAINTIFF were together in
Paris during Paris Fashion Week from on or about September 26, 2017 to on or about
October 5, 2017, D'ALESSIO specifically promised and represented to PLAINTIFF
that if she continued to work as D'ALESSIO'S creative partner and assist him with
actual and prospective commercial directing projects, including without limitation for
Jockey in India, Vivo in Kuala Lumper, Tomorrow Networks, and a major automobile
brand in Southeast Asia, then D'ALESSIO would bring PLAINTIFF with him on one
or more trips to Asia to pitch the projects and/or perform them; that D'ALESSIO would
pay PLAINTIFF fees for the projects and/or facilitate PLAINTIFF receiving fees from
the customers or agencies for such projects; D'ALESSIO would cause PLAINTIFF to
be credited on the projects; D'ALESSIO would cause, enable, support and/or mentor
PLAINTIFF in performing art directing and other services on the projects, including
such that PLAINTIFF would build toward qualifying for DGA membership; and would
otherwise mentor PLAINTIFF in a commercial directing career.

318.   In or about August 2017, including in texts and orally, GIBBS also
specifically promised and represented to PLAINTIFF to the effect that if PLAINTIFF
was a team player with defendants as to creative credits on PLAINTIFF'S creative
work (including foregoing same), and if PLAINTIFF otherwise was tolerant and lenient
with defendants with respect to defendants' promised obligations to her as to credits,
monthly fees, expense reimbursements and other matters, then defendants would

COMPLAINT

reward PLAINTIFF with a share of the fruits of success of the business and would be brought along with defendants in the business as it continued, which GIBBS intended PLAINTIFF to understand, and which PLAINTIFF did understand, as meaning as an equity holder, partner, and/or permanent or guaranteed employee.  PLAINTIFF is informed and believes and on that basis alleges that GIBBS, BORDO and RYDE STUDIOS either authorized or ratified these promises and representations from D'ALESSIO to PLAINTIFF.

319.   Between in or about November 19, 2017 and continuing to at least November 30, 2017, D'ALESSIO also specifically promised and represented to PLAINTIFF, including in multiple text messages, that if PLAINTIFF told her account of being raped by Westwick in 2014 to a reporter or otherwise publicized it, that D'ALESSIO, GIBBS, BORDO, RYDE STUDIOS and the Venture would both support PLAINTIFF emotionally, and specifically would not exclude PLAINTIFF from the business in any way or otherwise act to her detriment with respect to the business or her career and reputation, but instead would support her and be loyal to her.  PLAINTIFF is informed and believes and on that basis alleges that GIBBS, BORDO and RYDE STUDIOS either authorized or ratified these promises and representations from D'ALESSIO to PLAINTIFF.

320.   The above misrepresentations, acts of suppression and concealment, and/or false promises were material to PLAINTIFF, essential to the analysis undertaken by her, and she would not have acted as she did had Defendants not made the statements or engaged in the acts of suppression and concealment and/or false promises.

321.   D'ALESSIO, GIBBS and BORDO knew at the time that they made the affirmative misrepresentations and false promises that they were false, and knew at the time that they suppressed or concealed the material facts the effect such suppression or concealment would have.  In the alternative, PLAINTIFF is informed and believes and on that basis alleges that D'ALESSIO'S made at least some of his representations and promises to PLAINTIFF with the intent to perform them, but that GIBBS and/or

BORDO always knew at the time that D'ALESSIO was making the representations and promises to PLAINTIFF that GIBBS, BORDO, RYDE STUDIOS and/or Does 1 through 4 never intended to perform said promises and also always intended to influence or otherwise cause D'ALESSIO not to allow said promises to PLAINTIFF to be performed.  PLAINTIFF is further informed and believes and on that basis alleges that GIBBS, BORDO, and/or Does 1 through 4 in fact intentionally caused or otherwise influenced D'ALESSIO to break his promises and representations to PLAINTIFF and cause them to be false.

322.  D'ALESSIO, GIBBS, BORDO and Does 1 through 4 made the affirmative representations, false promises, and acts of suppression and concealment of material facts (and/or allowed D'ALESSIO to make them knowing that they would be false and would not be performed) with the intent and for the purpose of causing PLAINTIFF to change her position to her detriment.

323.  PLAINTIFF actually and justifiably relied on the affirmative misrepresentations, false promises and the facts as they stood given the suppression and concealment of other material facts in changing her position to her detriment.

324.  PLAINTIFF'S reliance on the affirmative misrepresentations, false promises and the facts as they stood given the suppression and concealment of other material facts was a proximate cause of actual damage to PLAINTIFF.

325.  PLAINTIFF actually relied on defendants' promises and representations in changing her position to her detriment, including by giving up her established and growing independent stylist and fashion consultant career, foregoing other opportunities, and in providing her valuable business contacts and industry and audience good will to defendants.  PLAINTIFF also specifically relied on the promises of D'ALESSIO regarding supporting and not shunning PLAINTIFF in PLAINTIFF'S decision to tell her Westwick rape story to a reporter and/or otherwise to publicize it, and the decision to do so materially changed PLAINTIFF'S position to her detriment,

including with respect to her career and reputation in the industry, and her vulnerability within the business with defendants.

326. PLAINTIFF'S reliance on the all of the above promises from defendants was reasonable and foreseeable, and indeed defendants made the promises to PLAINTIFF for the intended purpose of causing PLAINTIFF to rely on the promises substantially in the manner that she did.

327. PLAINTIFF'S reliance on defendants' promises caused her substantial detriment, including without limitation in the form of giving up her independent stylist and fashion consultant career, as well as her valuable business contacts and relationships, and in telling her account of the 2014 Westwick rape to the press. Had PLAINTIFF not acted in reliance on defendants' promises, PLAINTIFF is informed and believes and thereon alleges that PLAINTIFF was on track in her independent career such that she would have earned at least $300,000 (at least $5,000 per week) over a two year period beginning on or about June 1, 2017 and continuing through on or about May 31, 2019 (and would have earned even higher amounts going forward). By relying on defendants' promises, PLAINTIFF gave up those career opportunities and that value and may never be able to recover them.

328. D'ALESSIO, GIBBS and BORDO are thus liable to PLAINTIFF for general damages and special damages, as well as costs and other relief, all in amounts to be proven at trial, but not less than $300,000.00

329. PLAINTIFF is informed and believes and thereon alleges that during the operation of RYDE STUDIOS, the Venture, Doe 1 and D'ALESSIO'S commercial directing work, these three (or four) business entities (to the extent they are at all even claimed to be separate) shared many resources, such as office space, supplies and utilities. The employees of RYDE STUDIOS provided services to the Venture and to D'ALESSIO and Doe 1, and vice versa. PLAINTIFF is informed and believes and thereon alleges that at all times, D'ALESSIO held substantial ownership interests in each of these entities, and was an officer, director and/or managing member of each of

COMPLAINT

them, such that D'ALESSIO has had the effective power and authority to control all three (or four) entities.

330. PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO and/or Doe 1 caused the finances and other resources of all three (or four) entities to be intermingled and treated as one entity with the purpose of serving the needs, interests and desires of D'ALESSIO, in consistent and ongoing disregard for the corporate forms of the entities. PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO caused or ratified business practices whereby the three (or four) entities failed to observe corporate formalities, including without limitation failing to keep minutes from board meetings and failing to notify shareholders and other equity holders of board meetings and failing to record the equity interests of both actual and promised equity holders, including PLAINTIFF. PLAINTIFF is informed and believes and thereon alleges that D'ALESSIO and Doe 1 conducted the business of the three (or four) entities for their own personal benefit, and at the expense of the entities and the entities' equity holders. These acts demonstrate a unity of interest between D'ALESSIO and/or Doe 1 on the one hand, and RYDE STUDIOS and the Venture on the other hand, or among all of them, such that the legal fiction of these business entities as separate legal entities ceases to exist. Accordingly, any liability of D'ALESSIO, RYDE STUDIOS, the Venture and/or Doe 1 should be borne jointly and equally by each of them as if they were the same.

331. Accordingly, either D'ALESSIO, the Venture and/or Doe 1 are the true contracting parties (or additional contracting parties) to the above described false promise contract, or they are liable for the obligations and breaches of RYDE STUDIOS as if they were, pursuant to alter ego doctrine.

332. Plaintiff is informed and believes and on that basis alleges that RYDE STUDIOS and Does 1 through 4 knew by no later than on or about November 30, 2017 that D'ALESSIO, GIBBS and BORDO were engaged in the misconduct described above and that it was wrongful. Plaintiff is informed and believes and on that basis

COMPLAINT

alleges that with such knowledge, RYDE STUDIOS and/or Does 1 through 4 agreed to assist and did assist D'ALESSIO, GIBBS and BORDO in consummating their fraud against PLAINTIFF, including without limitation by actively assisting D'ALESSIO, GIBBS and BORDO in stripping PLAINTIFF of promised job responsibilities and opportunities, purporting to change the terms of PLAINTIFF'S business relationship with defendants in ways adverse to PLAINTIFF, and contrary to the promises and representations of defendants, and by actively assisting D'ALESSIO, GIBBS and BORDO in depriving PLAINTIFF of her earnings and other compensation, both earned and prospective.  Plaintiff is informed and believes and on that basis alleges that at a minimum, RYDE STUDIOS and/or Does 1 through 4 aided and abetted the fraudulent conduct of D'ALESSIO, GIBBS and BORDO by giving substantial assistance and/or encouragement to D'ALESSIO, GIBBS and BORDO.  RYDE STUDIOS and/or Does 1 through 4 are thus liable for the tortious conduct of D'ALESSIO, GIBBS and BORDO that they so aided and abetted, as if said aiding and abetting Defendants had engaged in said conduct themselves, or are otherwise vicariously liable to PLAINTIFF for such conduct, including without limitation under principles of agency and/or conspiracy.

333.   Defendants, and each of them, did the things herein alleged maliciously, knowingly, willfully and with the deliberate intention of injuring and oppressing PLAINTIFF and with conscious and reckless disregard of her rights.  Defendants' conduct was fraudulent, malicious and oppressive and, by reason thereof, PLAINTIFF is entitled to exemplary and punitive damages in an amount according to proof at trial.

## SEVENTH CLAIM FOR RELIEF

### ACCOUNTING

*(Against Defendants Ryde Studios, LLC, Richard D'Alessio and Doe 1)*

334.   PLAINTIFF realleges and incorporates herein by reference all of the foregoing and following paragraphs of this Complaint as if fully set forth.

335.   To the extent any of the allegations or theories in this Seventh Claim for Relief are inconsistent with other allegations or theories plead in this Complaint, they

COMPLAINT

are plead in the alternative.

336.   A relationship exists among PLAINTIFF and the defendants to this claim to relief, such that, especially under all the circumstances, legal remedies are inadequate to protect PLAINTIFF'S rights and an accounting in equity is necessary.

337.   An unknown balance is due for the value of PLAINTIFF'S ownership interests in RYDE STUDIOS, the Venture, D'ALESSIO'S commercial directing business, and/or Doe 1, including without limitation the fair market value of PLAINTIFF'S ownership interests and any distributions; that amount cannot be ascertained without an accounting; and the means of such accounting are within the knowledge of defendants or their agents.

338.   PLAINTIFF is further informed and believes and on that basis alleges that the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays judgment be entered in her favor and against Defendants, and each of them, as follows:

### *First Claim for Relief*
### *(Declaratory Judgment and Accounting pursuant to the Copyright Act)*

1.      For a declaratory judgment that PLAINTIFF be adjudicated as the sole author and sole owner of a one hundred percent (100%) interest, or co-author and co-owner of an undivided partial interest, in and to the copyright in each of the Claimed Works.

2.      To extent that any defendants have received any proceeds or revenues from the Claimed Works, PLAINTIFF seeks an accounting of said proceeds or revenues in the event that any defendants have received any of PLAINTIFF'S share of the fruits or proceeds of each of the Claimed Works.

COMPLAINT

***Second Claim for Relief***

***(Declaratory Judgment under the California Revised Uniform Partnership Act, Cal.***

***Corp. Code §§ 16100, et seq.)***

3.      For a judicial declaration that PLAINTIFF was, is and remains a partner of the Kat & Bare Venture, and is entitled to share in the profits of the partnership, including but not limited to all profits from the assets of the partnership that have been created so far.

***Third Claim for Relief***

***(Breach of Contract)***

4.      For general damages in amount to be proved at trial but believed to be at least $100,000.

5.      For such other general and special damages as may be shown by proof at trial.

6.      For prejudgment interest at the legal rate.

7.      For PLAINTIFF'S costs of suit.

8.      For such further relief as the Court deems just and proper.

***Fourth Claim for Relief***

***(Breach of the Covenant of Good Faith and Fair Dealing)***

9.      For general damages in amount to be proved at trial but believed to be at least $100,000.

10.      For such other general and special damages as may be shown by proof at trial.

11.      For prejudgment interest at the legal rate.

12.      For PLAINTIFF'S costs of suit.

13.      For such further relief as the Court deems just and proper.

COMPLAINT

***Fifth Claim for Relief***

***(Promissory Estoppel)***

14.     For general damages in amount to be proved at trial but believed to be at least $100,000.

15.     For such other general and special damages as may be shown by proof at trial.

16.     For prejudgment interest at the legal rate.

17.     For PLAINTIFF'S costs of suit.

18.     For such further relief as the Court deems just and proper.

***Sixth Claim for Relief***

***(Fraud)***

19.     For general damages subject to proof at trial but believed to be no less than $300,000.

20.     For punitive damages.

21.     For prejudgment interest at the legal rate.

22.     For imposition of a constructive trust upon all monies or other consideration received or to be received by defendants to this claim from exploitation of the business contacts and other resources and assets which PLAINTIFF provided to defendants in reliance on their false representations and false promises.

23.     For PLAINTIFF'S costs of suit.

24.     For such further relief as the Court deems just and proper.

***Seventh Claim for Relief***

***(Accounting)***

25.     For an accounting between PLAINTIFF and defendants;

26.     For payment over to PLAINTIFF of the amount due from each of the defendants as a result of the account and interest on that amount from and after the date

COMPLAINT

that each amount was due;

27.   For PLAINTIFF'S costs of suit;

28.   For such further relief as the Court deems just and proper.


Dated: March 7, 2018                                    ANDERSON YEH PC


                                    By: _____
                                              Edward M. Anderson
                                       Attorneys for Plaintiff HALEY CAMILLE
                                                    FREEDMAN

COMPLAINT

1

**DEMAND FOR JURY TRIAL**

2        On her Complaint against defendants RYDE STUDIOS, LLC; NICHOLAS

3  GIBBS; RICHARD D'ALESSIO; BECKY TAHEL BORDO; and DOES 1 to 10

4  inclusive, plaintiff HALEY CAMILLE FREEDMAN hereby demands a trial by jury of

5  all matters triable to a jury.

6

7  Dated: March 7, 2018                              ANDERSON YEH PC

8                                      By: _____

9                                              Edward M. Anderson

10                                         Attorneys for Plaintiff HALEY CAMILLE
                                                   FREEDMAN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

# **<u>EXHIBIT A</u>**

Kat&Bare (@katandbare) • Instagram photos and videos

Search



### katandbare  Follow

**159** posts        **17.3k** followers        **43** following

**Kat&Bare** Fashion Films





Kat&Bare (@katandbare) • Instagram photos and videos



Kat&Bare (@katandbare) • Instagram photos and videos



Kat&Bare (@katandbare) • Instagram photos and videos



Kat&Bare (@katandbare) • Instagram Photos and Videos



Kat&Bare (@katandbare) • Instagram photos and videos



Kat&Bare (@katandbare) • Instagram photos and videos



Kat&Bare (@katandbare) • Instagram photos and videos



Kat&Bare (@katandbare) • Instagram photos and videos



Kat&Bare (@katandbare) • Instagram photos and videos



Kat&Bare (@katandbare) • Instagram Photos and Videos



Kat&Bare (@katandbare) • Instagram photos and videos





ABOUT US    SUPPORT    BLOG    PRESS    API    JOBS

PRIVACY    TERMS    DIRECTORY    PROFILES    LANGUAGE

© 2018 INSTAGRAM